# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT
Case Nos. 23-1483/23-1484/23-1487/23-1489/23-1490/23-1491/23-1492/23-1493
/23-1496/23-1560/23-1561/23-1563/23-1564/23-1565

---

| | |
|---|---|
| JEFFREY FRANZ, et al. | (23-1483/23/1563) |
| STEVE ST. JULIANA, et al. | (23-1487/23-1561) |
| WILLIAM MYRE, et al. | (23-1489/23-1565) |
| KYLIE OSSEGE | (23-1491/23-1564) |
| MATTHEW MUELLER, et al. | (23-1493/23-1560) |

Plaintiffs - Appellees Cross-Appellants,
NICHOLETTE ASCIUTTO, et al. (23-1484); NICOLE BEAUSOLEIL et al. (23-1490); SANDRA A. CUNNINGHAM et al. (23-1492); JARROD WATSON et al. (23-1496),

Plaintiffs -Appellees,

v.

OXFORD COMMUNITY SCHOOL DISTRICT, et al.

Defendants

| | |
|---|---|
| NICHOLAS EJAK, et al. | (23-1483/23-1563) |
| | (23-1487/23-1561) |
| | (23-1489/23-1565) |
| | (23-1491/23-1564) |
| | (23-1493/23-1560) |

Defendants – Appellants Cross-Appellees
Defendants – Appellants (23-1484; 23-1490; 23-1492; 23-1496)

---

# DEFENDANTS-APPELLANTS' BRIEF ON APPEAL

## **Oral Argument Requested**

Submitted by:

TIMOTHY J. MULLINS (P28021)
KENNETH B. CHAPIE (P66148)
ANNABEL F. SHEA (P83750)
GIARMARCO, MULLINS & HORTON, P.C.
*Attorneys for Defendants-Appellants*
101 W. Big Beaver Road, 10th Floor
Troy, MI 48084-5280
(248) 457-7020
tmullins@gmhlaw.com
kchapie@gmhlaw.com
ashea@gmhlaw.com

## DISCLOSURE OF CORPORATE AFFILIATIONS
## AND FINANCIAL INTEREST

Pursuant to Fed. R. App. P 26.1, Appellees make the following disclosure:

1.  Are said parties a subsidiary or affiliate of a publicly owned corporation?

    NO

2.  Is there a publicly owned corporation, not a party to the appeal, that has a financial interest in the outcome?

    NO

# TABLE OF CONTENTS

DISCLOSURE OF CORPORATE AFFILIATIONS AND FINANCIAL INTEREST ................................................................................... iii

INDEX OF AUTHORITIES .............................................................. vi

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................................... x

STATEMENT OF JURISDICTION ..................................................... 1

INTRODUCTION ........................................................................... 2

STATEMENT OF ISSUES PRESENTED ............................................. 5

MOST CONTROLLING AUTHORITY ................................................ 7

STATEMENT OF THE CASE ............................................................ 8

1.     Plaintiffs Allege that E.C. Was a Preexisting Danger Before Defendants' Involvement ............................................................. 8

2.     Defendants' Limited Knowledge About EC ............................. 10

3.     Meeting with Hopkins and Ejak on November 30 ................... 11

PROCEDURAL HISTORY ............................................................... 14

STANDARD OF REVIEW ............................................................... 16

SUMMARY OF ARGUMENTS ......................................................... 17

LAW AND ARGUMENT ................................................................. 20

I.     DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY ......... 20

       1.     Defendants Did Not Violate Plaintiffs' Substantive Due Process Rights ................................................................. 20

A.     No State-Created Danger ......................................................22

     1.     No "Affirmative Act." ............................................. 23

         i.     Lipman, Nelson and Kallstrom are Distinguishable................................................34

         ii.     Plaintiffs' argument leads to bad policy...........39

     2.     No "Conscience-Shocking" Behavior .......................40

         i.     No knowledge of specific risk of harm ...........40

         ii.     No conscience shocking response to known risk of specific outcome ..................................45

   2.     Defendants Did Not Violate "Clearly Established" Constitutional Rights...............................................................................51

CONCLUSION ....................................................................................55

CERTIFICATE OF COMPLIANCE..................................................55

CERTIFICATE OF ELECTRONIC SERVICE .................................56

RELEVANT DISTRICT COURT DOCUMENTS ............................57

# INDEX OF AUTHORITIES

*Agema v. City of Allegan*, 826 F.3d 326 (6th Cir. 2016) ....................................17

*Armengau v. Cline*, 7 F. App'x 336 (6th Cir. 2001)............................................17

*Ashford v. Raby*, 951 F.3d 798 (6th Cir. 2020)......................................................51

*Barber v. Overton*, 496 F.3d 449 (6th Cir. 2007) ................................................37

*Beck v. Hamblen Cty. Tennessee*, 969 F.3d 592 (6th Cir. 2020) ........................52

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)................................................17

*Binay v. Bettendorf*, 601 F.3d 640 (6th Cir. 2010) .............................................20

*Brooks v. Knapp*, 221 Fed. Appx. 402 (6th Cir. 2007).................................. 31,39

*Brown v. Detroit Pub. Sch. Cmty. Dist.*, 763 F. App'x 497
(6th Cir. 2019)........................................................................................................21

*Bukowski v. City of Akron*, 326 F.3d 702
(6th Cir. 2003)............................................................... 23,24,25,33,37,47,49,50

*Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2003) ........... 25,33,37

*City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9 (2021)...............................52

*Collins v. City of Harker Heights*, 503 U.S. 115 (1992) ....................................21

*Culp v. Rutledge*, 343 F. App'x 128 (6th Cir. 2009)...................................... 31,32

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*,
489 U.S. 189 (1989)...............................................................................................21

*District of Columbia v. Wesby*, ⸺ U.S. ⸺, 138 S. Ct. 577 (2018) ..............20

*Doe v. Claiborne Co. Bd. of Ed.*, 103 F.3d 495 (6th Cir. 1996)...........................22

*Domingo v. Kowalski*, 810 F.3d 403 (6th Cir. 2016)...........................................46

*Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485
(6th Cir. 2019)......................................................................................22

*Ewolski v. City of Brunswick*, 287 F.3d 492 (6th Cir. 2002) .................... 23,40,41

*Gohl v. Livonia Public Schools*, 836 F.3d 672 (6th Cir. 2016)..........................46

*Handy-Clay v. Memphis*, 695 F.3d 531 (6th Cir. 2012) .......................................17

*Jane Doe v. Jackson Loc. Sch. Dist. Bd. Of Educ.*, 954 F.3d 925
(6th Cir. 2020) ................................................................................. 20,21

*Jones v. Reynolds*, 438 F.3d 685
(6th Cir. 2006)............................................. 18,21,22,25,31,34,37,38,39,51,53,54

*Kallstrom v. City of Columbus*, 136 F.3d 1055
(6th Cir. 1998)............................................. 18,23,24,34,35,36,37,38,54

*Kollaritsch v. Michigan State Univ.*, 944 F.3d 613 (6th Cir. 2019) ...................52

*Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007)............. 18,26,37,32,34,37,38,53

*Lillard v. Shelby Cnty. Bd. of Educ.*, 76 F.3d 716 (6th Cir. 1996) ............... 20,45

*Lipman v. Budish*, 974 F.3d 726 (6th Cir. 2020) ................. 16,18,34,35,36,37,54

*Malley v. Briggs*, 475 U.S. 335 (1986) ..............................................................20

*Martin v City of Broadview Hts*, 712 F3d 951 (6th Cir. 2013).............................1

*May v. Franklin Cty. Comm'rs*, 437 F.3d 579 (6th Cir. 2006) ................ 31,37,39

*McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460
(6th Cir. 2006).................... 24,29,30,32,33,36,37,40,41,43,44,45,47,48,49,53,54

*Mitchell v Forsyth*, 472 US 511 (1985) ...............................................................1

*M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*,
1 F.4th 436 (6th Cir. 2021) ..................................................................24

*Nelson v. City of Madison Heights,* 845 F.3d 695
(6th Cir. 2017)..................................................... 18,34,35,36,37,38,54

*Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356 (6th Cir. 2012).......... 28,32,37

*People v Crumbley,* ___Mich App____; ____NW2d____ (2023)
(Docket Nos. 362210, 362211) ........................................................9,13

*Peete v. Metro. Gov't of Nashville & Davidson Cnty.*, 486 F.3d 217
(6th Cir. 2007)..................................................................................23

*Przybysz v. City of Toledo*, 746 F. App'x 480 (6th Cir. 2018)................. 37,38,54

*Reichle v. Howards*, 566 U.S. 658 (2011) ...........................................51

*Reilly v. Ottawa Cnty.,* No. 20-2220, 2021 WL 3929324,
(6th Cir. Sept. 2, 2021), cert. denied sub nom. 142 S. Ct. 900 (2022) ...............30

*Sacramento v. Lewis*, 523 U.S. 833 (1998) ...........................................20

*Schroder v. City of Fort Thomas*, 412 F.3d 724 (6th Cir. 2005) .................. 22,45

*Stewart v. City of Euclid, Ohio*, 970 F.3d 667 (6th Cir. 2020)...........................51

*Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834
(6th Cir. 2016)................................................................................. 23,24

*Thomas v. Noder-Love*, 621 F. App'x 825 (6th Cir. 2015) ........................... 17,22

*Tucker v. City of Richmond,* 388 F.3d 216 (6th Cir. 2004) .................................16

*Walker v. Detroit Pub. Sch.*, 535 Fed. Appx. 461 (6th Cir. 2013) ...... 29,30,37,53

*Webb v. McCullough*, 828 F.2d 1151 (6th Cir. 1987) ...................................21

*Wilson v. Gregory*, 3 F.4th 844 (6th Cir. 2021).................................... 24,32

## Statutes

28 USC § 1291 ...........................................................................................1

## Rules

Fed. R. Civ. P. 12(c)........................................................................ 57,58

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to F.R.A.P. 34, Defendants-Appellants request oral argument. This matter involves complex legal issues (e.g., the doctrine of qualified immunity) that merit a full/complete dialogue, something best accomplished through an extended oral exchange between the Court and the parties' counsel.

# STATEMENT OF JURISDICTION

This Court has jurisdiction under the collateral-order doctrine because this matter involves an appeal of the District Court's denial of Defendants-Appellants' assertion of qualified immunity. *See* 28 USC § 1291; *Mitchell v Forsyth*, 472 US 511, 530 (1985); *Martin v City of Broadview Hts*, 712 F3d 951, 957 (6th Cir. 2013). This appeal does not involve disputed facts; rather, it presents the purely legal question of whether the District Court mistakenly held that Defendants' actions violated "clearly established" law. For these reasons, this Court has jurisdiction. *Id.*

**INTRODUCTION**

This is an appeal of the denial of qualified immunity. This case arises from the November 30, 2021, school shooting at Oxford High School ("OHS"). Student Ethan Crumbley ("E.C.") brought a handgun to OHS with a plan to murder his classmates. Plaintiffs, the victims of the shooting, sued Oxford Community Schools counselor Shawn Hopkins and Dean of Students Nick Ejak ("Defendants"). Plaintiffs allege that Defendants violated Plaintiffs' substantive due process rights by telling E.C.'s parents E.C. needed counseling.

Plaintiffs allege that E.C. planned this school shooting for eight months before it occurred, and well before he interacted with Defendants. In August 2021, E.C. told his friend he would commit a school shooting. E.C. kept a journal detailing his plans to commit this terrible act. On the night before the shooting, E.C. wrote in his journal he planned to follow through with the school shooting the next day. He then posted on social media a reference to executing his plan on November 30. On the morning of the shooting, November 30, E.C. snuck a gun into school with the intent to carry out a school shooting later that afternoon.

After all of that preparation occurred, on the morning of November 30, E.C. was called to Hopkins' office. The purpose of the meeting was to discuss some vague but concerning drawings and statements E.C. wrote on his math assignment. E.C.'s parents were also called to meet. During the meeting Hopkins told E.C.'s parents

that E.C. needed counseling. After the parents resisted, Plaintiffs alleged that Defendants told the parents if they did not obtain counseling for E.C. within 48 hours, Defendants would contact CPS. Plaintiffs do not allege that Defendants knew E.C. had a gun or planned to shoot his classmates. Two hours after this meeting, E.C. carried out his long-standing plan to commit the school shooting.

This appeal raises the issue of whether Defendants' alleged comment was a "state created danger," when it is undisputed that the shooter had planned this exact shooting for months and already brought a gun at school to carry out the shooting before interacting with Defendants. This appeal also raises the issues of whether Defendants could be liable when they did not know of E.C.'s plan, and whether recommending counseling to a student's parents is conscience shocking.

This claim should be dismissed. This Court has repeatedly found that where the risk of the type of harm that ultimately occurs existed *before* the state actor intervened then there is no state *created* danger. This Court also found that Defendants cannot be liable absent knowledge of the *specific* risk of danger E.C. posed. But Plaintiffs argue that Defendants did not know E.C. had a gun or a plan. The lower court's opinion—if allowed to stand—would be bad public policy and disincentivize teachers and counselors from trying to help. There is no dispute that, had teachers and counselors simply ignored E.C.'s behavior, there would be no liability whatsoever. However, because they tried to help a student—and in a manner

3

wholly reasonable—they now face liability.

## STATEMENT OF ISSUES PRESENTED

1. Was Defendants' alleged warning to the student's parents to get the student counseling within 48 hours or they would contact CPS an affirmative act that created or greatly increased the risk of a school shooting, when it is undisputed that the student-shooter had planned this exact shooting for months and already had a gun at school with him to carry out the shooting before interacting with Defendants?

   **NO.**

2. Are Defendants aware of the *specific* risk of a school shooting occurring based only on not believing the student's explanation that his drawings related to a video game and believing the student may be suicidal, but not knowing that the student had a gun, a plan to commit acts of violence toward others, or any history of behavioral issues at all?

   **NO.**

3. Did Defendants commit a conscience shocking act by recommending counseling support to a student they believed may have some mental distress?

   **NO.**

4. Are Defendants entitled to qualified immunity when the Sixth Circuit and Supreme Court have not found a state created danger under the circumstances presented here?

   **YES.**

# MOST CONTROLLING AUTHORITY

*Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006)

*Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007)

*McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460 (6th Cir.2006)

*Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003)

*Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2003)

*Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ.*, 954 F.3d 925 (6th Cir. 2020)

## STATEMENT OF THE CASE

**1.    Plaintiffs Allege that E.C. Was a Preexisting Danger Before Defendants' Involvement.**

Plaintiffs' complaints begin by alleging that E.C. was a preexisting danger to shoot students at school long before Defendants' involvement.

The allegations include claims that as early as March 2021, E.C. kept a bird's head in his bedroom, researched Nazi propaganda on his home computer, had homicidal tendencies, made videos of himself torturing and killing animals, and told his mother he had hallucinations. *Myre v. Oxford Complaint,* RE 6, Page ID # 79, ¶ 30-31,37.

Plaintiffs allege that as in August 2021, E.C. privately announced to a friend he would shoot up the school and had access to his father's gun. *Id.* at Page ID # 80, ¶ 39. Plaintiffs also claim that in August 2021, E.C. sent a video of himself holding his father's handgun along with the message stating: "it's time to shoot up the school!" *Watson v. Oxford Complaint*, RE 1, Page ID # 13, ¶ 36. Plaintiffs further claim that, well before any Oxford Defendants' involvement, EC made videos and kept journals describing "his plan to shoot up the school." *Id.* at Page ID # 79, ¶ 33.

As for E.C.'s journal, it **"contained twenty-one (21) pages detailing his plans to carry out the OHS shooting. In part, the journal stated…*the shooting is tomorrow, I have access to the gun and ammo*."** *Watson v. Oxford Complaint*,

RE 1, Page ID # 22, ¶¶ 75-76; *Meuller v. Oxford Complaint*, RE 1, Page ID # 21, ¶ 11. More specifically, "[e]very one of the 21 pages of written material had reference to plans to commit a school shooting. In one entry, for example, E.C. wrote, 'I will cause the biggest school shooting in Michigan's history,' and, 'I will kill everyone I f**king see.' E.C. also described a specific plan, explaining 'the first victim has to be [a] pretty girl with a future so she can suffer like me.' That same page contained a drawing of a girl being shot in the back of her head. E.C. partially blamed [his parents] in the journal, writing: 'I have fully mentally lost it after years of fighting with my dark side. My parents won't listen to me about help or a therapist,' and, 'I have zero help for my mental problems and it's causing me to shoot up the f**king school.'" *People v. Crumbley,* ___Mich. App.____; ____N.W.2d____ (2023)(Docket Nos. 362210, 362211). "The last entry in E.C.'s journal was written the day before [the shooting], where he noted that he had the gun and ammunition, specifically mentioning the nine-millimeter SIG Sauer, and proclaimed the school shooting would be the next day." Id. at *4, n.7.

Plaintiffs also claim that on November 11, 2021, EC placed a jar containing a severed bird's head in the boys' bathroom. *Myre v. Oxford Complaint,* RE 6, Page ID # 81, ¶ 47.

On November 26, 2021, Plaintiffs claim that James Crumbley purchased a handgun for E.C., and that Jennifer Crumbley took E.C. to the shooting range. *Id.* at

Page ID # 82-83, ¶¶ 54-56.

On the night of November 29, 2021, Plaintiffs allege that E.C. cryptically posted on Twitter a reference to carrying out a school shooting the next day; the day the shooting actually occurred. *St. Juliana v. Oxford Complaint*, RE 1, Page ID # 16, ¶ 53.

Plaintiffs do **not** allege that any District employees knew E.C. was responsible for the bird head. Plaintiffs also do **not** allege that Defendants knew of any of the remaining above alleged acts before the shooting, including that E.C. planned a school shooting or that he had a gun.

## 2. Defendants' Limited Knowledge About EC.

Plaintiffs claim that in early November 2021, EC's Spanish teacher emailed Hopkins stating that E.C. "appeared sad", nothing more. *Myre v. Oxford Complaint,* RE 6, Page ID # 81, ¶ 45. Hopkins appropriately responded to the vague email by "check[ing] in with E.C. and told him that he was available if E.C. wanted to talk." *Id.* at ¶ 46.

On Monday, November 29, 2021–at the beginning of hunting season in a hunting community–Plaintiffs claim that teacher Jackie Kubina saw E.C. looking at a picture of bullets on his cell phone. *Id.* at Page ID # 83, ¶ 59. While students having an interest in guns and hunting is common in Oxford, Plaintiffs claim that Kubina brought E.C. to the counseling office to meet with Pam Fine. *Id.* at ¶ 60. This

concern, if anything, shows hypervigilance.

Plaintiffs claim that on the morning of November 30, unknown to Defendants or any other school employee, E.C. brought a gun and 48 rounds of ammunition with him to school with the intent of shooting his classmates. *Meuller v. Oxford Complaint*, RE 1, Page ID # 21 ¶ 111.

Plaintiffs then claim that later the morning of the shooting, November 30, teacher Allison Karpinski witnessed E.C. watch a video with violent depictions on his cell phone. The video was similar to Call of Duty or Fortnite video games that kids that age routinely watch on YouTube. Plaintiffs assert that Karpinski made a report to Hopkins. *Myre v. Oxford Complaint,* RE 6, Page ID # 86, ¶ 73. Again, this response shows that District employees take even innocuous concerns seriously.

Plaintiffs next claim that also later that morning of November 30, 2021, E.C. appeared in teacher Becky Morgan's class. *Id.* at Page ID # 85, ¶ 69. Plaintiffs allege that Morgan witnessed E.C. on this one occasion write violent phrases and draw violent pictures on his math assignment. *Id.* at ¶ 70. E.C.'s drawing did not contain a specific threat of violence towards any individual at the high school. *Id.* In response to witnessing this single incident, Morgan immediately sent a picture of the drawing to Hopkins. *Id.* at Page ID # 86, ¶ 72.

3.    **Meeting with Hopkins and Ejak on November 30.**

After being informed of the drawing, Plaintiffs allege Hopkins pulled E.C.

from class to meet in Hopkins' office. *Id.* at ¶ 75. E.C. left his backpack in the class, leaving the impression that the backpack and its contents were unimportant to EC. *Id.* at Page ID # 87, ¶ 77. While Hopkins met with EC, Ejak retrieved E.C.'s backpack from the classroom but did not look inside the bag. *Id.* at ¶ 78. Plaintiffs allege that E.C. had his gun in his backpack.

During the meeting, Plaintiffs claim Hopkins questioned E.C. about the drawing. E.C. responded that "it was just a drawing for a video game." *Id.* at ¶ 80. Plaintiffs claim that Hopkins was not satisfied with the explanation, so Hopkins questioned E.C. in detail about "the specifics of the drawing." *Id.* at ¶ 81. Plaintiffs allege that Hopkins was able to get E.C. to open up about his dog dying, the death of a grandparent, the pandemic, a close friend who left the school, and an argument E.C. had with his parents about grades the night before, which are typical student concerns counselors regularly address. *Id.* at ¶ 82. Hopkins then asked E.C. if he was a threat to himself or others. *Meuller v. Oxford Complaint*, RE 1, Page ID # 25, ¶ 129. E.C. assured Hopkins he was not. *Id. at* Page ID # 25, ¶ 130. While Hopkins did not believe based on the circumstances that E.C. posed a risk of danger to others, Plaintiffs claim that Hopkins thought there may be evidence of "suicidal ideation." As a result, Hopkins acted reasonably and called Mrs. Crumbley to meet. *Myre v. Oxford Complaint,* RE 6, Page ID # 88-87, ¶ 83. Plaintiffs do not allege that E.C. ever expressed any threats of harm to himself or others or indicate that he had a

weapon.

At approximately 10:30 AM, E.C.'s parents arrived for a meeting. Hopkins showed the parents E.C.'s drawing and advised them that E.C. needed mental health support that day. *Id.* at Page ID # 88, ¶ 86. E.C.'s parents would not take E.C. out of school. *Id.* at ¶ 87. Plaintiffs claim that Hopkins took the reasonable action of advising E.C.'s parents that if they did not have E.C. "seen for mental health counseling within 48 hours," "he would report them to Child Protective Services ("CPS")." *St. Juliana v. Oxford Complaint*, RE 1, Page ID # 21, ¶ 89; *Watson v. Oxford Complaint,* RE 1 Page ID # 29, ¶ 113. This is the statement that is at issue in the appeal.

Following the meeting with the parents, Defendants determined there was no disciplinary reason to withhold E.C. from school. Consistent with E.C.'s legally protected right to an education, E.C. returned to class. *Id.* at ¶ 90. On his way out, "Hopkins …told E.C., 'I just want you to know, I care about you'". *People v. Crumbley*, 2023 WL 2617524, at *5.

Thereafter, Plaintiffs allege that EC carried out his shooting, just as he planned before meeting with Hopkins. *Myre v. Oxford Complaint,* RE 6, Page ID # 89, ¶ 96. E.C. was charged as an adult for his premediated actions. *Id.* at Page ID # 90, ¶ 102. He has since pleaded guilty to all counts.

Notably, Plaintiffs do not allege that any of the individual Defendants knew

that E.C. had a gun or that he intended to harm any students. Also absent is any suggestion that E.C. had previously engaged in violent behavior or had any prior disciplinary history.

## PROCEDURAL HISTORY

The families of the students who were shot and multiple bystanders to the shooting filed suit against the District and nine District employees, including Hopkins and Ejak. Nearly all of the lawsuits made identical factual and legal claims. Each lawsuit asserted a *Monell* claim against the School District. Each lawsuit also alleged that Defendants violated the victims' substantive due process rights under a state created danger theory.

Plaintiffs' lawsuits asserted that Defendants committed a number of alleged acts that they claim caused the shooting to occur. But most of the alleged acts were an alleged failure to act, such as a failure to contact police, search E.C.'s backpack, and remove him from school. Plaintiffs also alleged that Ejak's act of allegedly returning E.C.'s backpack not knowing it contained the gun, and thereby returning E.C. to the same threat he was before entering Hopkins' office, was an affirmative act. Finally, Plaintiffs argued that Hopkins' alleged warning to E.C.'s parents about contacting CPS somehow provoked E.C. to act.

On December 12, 2022, the district court ordered Defendants to file a single motion to dismiss that would apply to all the cases, and all Plaintiffs would file one

collective response. *Franz v. Oxford Common Order*, RE 105, Page ID # 1755.

On December 22, 2022, Defendants filed a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). Defendants argued that Plaintiffs' substantive due process claims against the individual Defendants were barred by qualified immunity because Plaintiffs could not meet either element of the qualified immunity test. Defendants also argued that the *Monell* claim against the District failed because Plaintiffs had not established a constitutional violation.

On May 12, 2023, the district court issued its opinion granting in part and denying in part Defendants' motion. *Franz v. Oxford Opinion*, RE 142, Page ID # 2219. The court found that Plaintiffs' claims regarding an alleged failure to act could not be a substantive due process violation, because the failure to act is not an affirmative act as a matter of law. The court also found that the act of returning the backpack to E.C. was not a substantive due process violation because it is well-established that returning a person to a pre-existing danger is not an affirmative act.

The court then turned to whether Hopkins and Ejak's alleged warning that he would contact CPS was an affirmative act. The court denied qualified immunity to Hopkins and Ejak on this claim; all other individual Defendants were dismissed. The court began by finding, "[a]ll facts indicate that E.C. came to school on November 30, 2021, prepared to commit a shooting. The risk that E.C. would do so was 'a pre-existing danger.'" RE 142, Page ID # 2228. Despite this finding, the court still found

it was a question of fact whether Defendants' alleged warning to the parents was an affirmative act that greatly increased the risk of a school shooting. That was error, as these two holdings cannot both be true. The court came to this conclusion by relying on *Lipman v. Budish*, 974 F.3d 726 (6th Cir. 2020), which is distinguishable from this case.

The court also found that Plaintiffs sufficiently alleged that Defendants were aware of the *specific* risk of harm that EC posed by alleging they did not believe E.C.'s explanation that he was drawing a video game and thought he had suicidal ideations. The court did not find, however, that Plaintiffs plead that Defendants knew E.C. had a gun or that E.C planned to harm his classmates. The court also found that it could not determine whether the alleged comment was conscience shocking.

Defendants appeal the denial of qualified immunity related to Plaintiffs' "allegations that Hopkins and Ejak increased the risk of harm to Plaintiffs or their decedents by threatening, in E.C.'s presence, to report E.C.'s parents to Child Protective Services if they did not provide E.C. with counseling." Id.

## STANDARD OF REVIEW

This Court reviews *de novo* a district court's denial of a motion for judgment on the pleadings on qualified immunity grounds. *Tucker v. City of Richmond,* 388 F.3d 216, 219 (6th Cir. 2004).

"To survive a motion to dismiss, a litigant must allege enough facts to make

it plausible that the defendant bears legal liability. The facts cannot make it merely possible that the defendant is liable; they must make it plausible." *Agema v. City of Allegan*, 826 F.3d 326, 331 (6th Cir. 2016). Conclusory allegations are not enough to survive a motion to dismiss. *Handy-Clay v. Memphis*, 695 F.3d 531, 539 (6th Cir. 2012). A plaintiff must also provide more than a "formulaic recitation of the elements of a cause of action" and his or her "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-556, (2007).

In ruling on a motion to dismiss, the court may consider the complaint as well as: (1) documents that are referenced in the plaintiff's complaint and that are central to plaintiff's claims; (2) matters of which a court may take judicial notice; (3) documents that are a matter of public record; and (4) letters that constitute decisions of a governmental agency. *Thomas v. Noder-Love*, 621 F. App'x 825, 829 (6th Cir. 2015); *Armengau v. Cline*, 7 F. App'x 336, 344 (6th Cir. 2001) ("take[] liberal view of what matters fall within the pleadings….").

## SUMMARY OF ARGUMENTS

The district court erred in denying Defendants qualified immunity. To start, Plaintiffs have not plead a substantive due process violation. Substantive due process claims are the rarest of constitutional violations that seek to prevent arbitrary acts of government oppression that are so brutal and inhumane as to be conscience

shocking. The state created danger variant, which allows government officials to be held responsible for private acts of violence, is even rarer. These claims require proof that 1.) Defendants committed an affirmative act, 2.) Defendants knew of the *specific* risk of the harm that later occurred, and 3.) Defendants responded to that specific risk in a conscience shocking manner. Plaintiffs cannot prove any of these elements.

To establish an actionable affirmative act, Plaintiffs must show that Defendants committed an act that created or greatly increased the risk of harm. To make this determination, this Court compares the risk of harm to Plaintiffs *before* and *after* the state intervention, not *during*. So, even if the state actor commits some act, where the risk of the harm that ultimately occurred existed *before* the state intervention, then Plaintiffs cannot meet the affirmative act element. And no affirmative act can be shown where the injury would have occurred if Defendants had not acted at all. Based on *Jones v. Reynolds* and *Koulta v. Merciez,* there is no affirmative act in this case. Here, Plaintiffs pled that the risk of harm—a school shooting—existed before Defendants' interaction with EC. Plaintiffs alleged that EC planned to commit a school shooting and brought a gun to school with him on November 30 to shoot his classmates *before* meeting with Defendants. Therefore, Plaintiffs have not pled that Defendants' actions created or greatly increased the risk of harm here. Cases such as *Lipman, Kallstrom* and *Nelson* do not alter that conclusion. Those cases are distinguishable because the risk of harm that ultimately

occurred—retaliatory violence—did not exist before the state action and the injury would not have occurred absent the state action. The same cannot be said here.

Additionally, Plaintiffs have not plead that Defendants knew of the *specific* risk of harm that ultimately occurred. Knowledge of a *general* risk of harm is not enough. In the context of a school shooting, this Court found that absent knowledge that the student had a gun or planned to commit an act of gun violence, a plaintiff could not prove this level of knowledge. Here, Plaintiffs have **not** alleged that Defendants knew EC had a gun or that he planned to commit a school shooting.

Finally, Defendants' actions did not shock the conscience under the circumstances. Conscience shocking behavior is defined as conduct so brutal and inhumane it shows an intent to harm. Defendants' actions in trying to help a student based on limited information, not knowing of his plan or possession of a gun, cannot be said to meet this high standard.

Plaintiffs also cannot establish that the constitutional right at issue was clearly established under the particular circumstances of this case. There are no cases from this Circuit or the Supreme Court finding liability under the circumstances presented here. Rather, the opposite is true. Every similar case in this Circuit has been dismissed because there was no constitutional violation.

# LAW AND ARGUMENT

## I.  DEFENDANTS ARE ENTITLED TO QUALIFIED IMMUNITY.

Qualified immunity is an absolute defense to § 1983 claims. *Binay v. Bettendorf*, 601 F.3d 640, 647 (6th Cir. 2010). The doctrine is designed to protect "all but the plainly incompetent who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Once a qualified immunity defense is raised, "the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Binay,* 601 F.3d at 647. To overcome a qualified-immunity defense, Plaintiffs must show two things: 1.) that government officials violated a constitutional right and 2.) that the unconstitutionality of their conduct was clearly established when they acted. *District of Columbia v. Wesby*, —— U.S. ——, 138 S. Ct. 577, 589 (2018).

### 1.  DEFENDANTS DID NOT VIOLATE PLAINTIFFS' SUBSTANTIVE DUE PROCESS RIGHTS.

The Due Process Clause of the Fourteenth Amendment states that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." *Sacramento v. Lewis*, 523 U.S. 833, 840 (1998). The substantive component of the Due Process Clause is "quite different" than a mere tort claim, such as negligence or assault and battery under state law.  *Lillard v. Shelby Cnty. Bd. of Educ*., 76 F.3d 716, 725 (6th Cir. 1996); *Jane Doe v. Jackson Loc. Sch. Dist. Bd. of Educ*., 954 F.3d

925, 933 (6th Cir. 2020) (Supreme Court "has long resisted turning due process into a 'font of tort law.'").

Substantive due process instead relates to the "rights to personal security and freedom from abuse at the hands of state officials." *Webb v. McCullough*, 828 F.2d 1151, 1158 (6th Cir. 1987). Such claims are reserved for "only the most egregious official conduct" that is arbitrarily and "oppressively" exercised. *Lewis*, 523 U.S. at 846. Thus, substantive due process claims focus on truly extreme abuses of a government officials' power that are "so brutal, demeaning, and harmful as literally to shock the conscience." *Webb*, 828 F.2d at 1158. "The conscience-shocking limit on substantive due process claims serves to keep the doctrine from expanding to cover administrative incompetence or irresponsibility." *Brown v. Detroit Pub. Sch. Cmty. Dist.*, 763 F. App'x 497, 504 (6th Cir. 2019). Such claims are narrowly interpreted, as the Supreme Court has cautioned against "expand[ing] the concept of substantive due process." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992).

As a general rule, no substantive due process violation occurs when the injury is caused "by private actors," such as a student. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 (1989). Courts have recognized two narrow exceptions to this rule: (1) when the state has a special relationship to the victim, and (2) when the state creates the danger that led to the victim's harm. *Jones v. Union*

*County*, 296 F.3d 417, 428 (6th Cir. 2002).

Since it is well established that there is no "special relationship" between school employees and students, *Doe v. Claiborne Co. Bd. of Ed.*, 103 F.3d 495, 510 (6th Cir. 1996), this Appeal concerns the application of the state created danger exception. This Court described such claims as "a rare species of one of the narrowest doctrines of constitutional law." *Jackson*, 954 F.3d at 937.

### A.    No State-Created Danger.

The state created danger exception "does not have a strong foundation" in law. *Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019). To the extent the state-created danger exception exists, these claims require: (1) an affirmative act by the State that either created or increased the risk that the plaintiff would be exposed to private acts of violence; and (2) the affirmative act is conscience shocking under the circumstances. *Jackson Loc. Sch. Dist.*, 954 F.3d at 932, 934. This test is a "demanding standard." *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006).

Proof of conscience shocking conduct is important to ensure "that the standards for proving a state-created-danger violation based on governmental inaction correspond to the standards necessary for proving a substantive due process violation based on governmental action." *Schroder v. City of Fort Thomas*, 412 F.3d 724, 728, 730 (6th Cir. 2005). The test for determining *private-actor* harm should

not be easier to meet than the framework that governs *state-actor* harm, which emphasizes the requirement of proving conscience shocking conduct. *Jackson Loc. Sch. Dist.*, 954 F.3d at 932. Here, Plaintiffs have not established that Defendants committed affirmative acts that are conscience shocking.

### 1. No "Affirmative Act."

Defendants did not commit an "affirmative act" when they allegedly advised E.C.'s parents they would contact CPS if they did not get their son mental health counseling, because it is well documented that E.C. already planned to commit the exact harm that ultimately occurred—a school shooting—before the alleged warning.

"Whether or not the defendants 'acted' may be a difficult question in the abstract." *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003). To start, a failure to act to protect students is not an affirmative act, even in the face of a known danger. *Stiles ex rel. D.S. v. Grainger Cnty., Tenn.*, 819 F.3d 834, 855 (6th Cir. 2016).

For there to be liability, it is not just a matter of whether the official committed an act. *Kallstrom v. City of Columbus*, 136 F.3d 1055, 1067 (6th Cir. 1998); *Ewolski v. City of Brunswick*, 287 F.3d 492, 509 (6th Cir. 2002). An affirmative act that leads to liability is found when the state official's affirmative act "causes or **greatly** increases the risk of harm to its citizens." *Peete v. Metro. Gov't of Nashville &*

*Davidson Cnty.*, 486 F.3d 217, 223 (6th Cir. 2007)(emphasis added); *see also M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 448 (6th Cir. 2021)("when the State 'cause[s] or greatly increase[s] the risk of harm to its citizens…'"); *Kallstrom*, 136 F.3d at 1066 ("it may not cause or greatly increase the risk of harm…"); *Draw v. City of Lincoln Park*, 491 F.3d 550, 554 (6th Cir. 2007)("greatly increase[s]").

Whether the state created or "greatly" increased the risk of harm is determined by comparing the plaintiff's risk of harm *before* and *after* state action, not *during* the state's intervention. *Wilson v. Gregory*, 3 F.4th 844, 858 (6th Cir. 2021). In other words, if the victim already faces a similar type of danger that ultimately occurs *before* the state action, there is no affirmative act that creates or greatly increases the risk of harm. So, even if "the state officials performed some act," no affirmative act will be found where "**the victim would have been in *about the same* or even greater danger even if the state officials had done nothing**." *See McQueen v. Beecher Cmty. Sch.*, 433 F.3d 460, 466 (6th Cir. 2006) (emphasis added). Similarly, state action that "affirmatively returns a victim to a preexisting situation of danger does not create or increase the victim's risk of harm." *Stiles*, 819 F.3d at 855; *see Bukowski*, 326 F.3d at 709 ("merely returning a person to a situation with a preexisting danger" is not an affirmative act).

This Court has repeatedly found no affirmative act, even though the state

official performs some act, when the victim already faced a similar type of danger that ultimately occurs *before* the state action. For example, in *Cartwright v. City of Marine City*, 336 F.3d 487 (6th Cir. 2003), the police picked up the plaintiff while he was walking at night on the side of the highway and dropped him off at a convenience store parking lot. *Id.* at 489. The plaintiff was hit by a truck two miles away. The Sixth Circuit rejected the argument that the police committed an affirmative act because the police transported the plaintiff from a more dangerous place to a less dangerous one. *Id.* at 493. This Court reasoned that the plaintiff was already facing a pre-existing dangerous situation before police intervened. *Id.* Similarly, *in Bukowski*, 326 F.3d at 709, this Court found that the police officers' act of taking custody of mentally disabled woman from a suspect who had been abusing her, then returning her to the suspect who then raped her, was not an affirmative act because the danger existed before police intervened.

This principle is further illustrated in *Jones v. Reynolds*, 438 F.3d 685 (6th Cir. 2006), where this Court found no affirmative act when police actually encouraged a private actor to perform an act that resulted in injury. In *Jones,* police officers came upon a crowd who, as it turns out, were spectators awaiting the beginning of a drag race. Upon seeing police, drag racers intended to abandon the race. But they proceeded with the race when one officer told a participant to "'go ahead and race.'" 438 F.3d at 688. Police then played rap music over their PA system

to the delight of the crowd and placed bets on the race. During the race a driver lost control and bystanders were killed. The decedent's estate sued under a state-created danger theory. This Court affirmed the dismissal of the claim.

Despite the officer's actions in actively encouraging the race to occur, this Court nonetheless found that the officers did not commit an "affirmative act" that caused or greatly increased the risk of injury or death. *Id.* at 691. This was so even though "the drag racers planned to abandon the race once they saw the officers and would not have proceeded with the race had the officers not told them they could do so." *Id.* at 692. This Court reasoned that the risk of the type of harm that ultimately occurred existed before police intervened, as the drivers planned to drag race before the police arrived. *Id.* "Even if an officer bet on the drag race, as one spectator alleges, and even if the officers played rap music for 15 minutes rather than 2 minutes, as other spectators allege, that does not change matters. While such conduct certainly would not have discouraged the participants from proceeding with the race, it also cannot be said that it placed the drivers or spectators in greater danger than if the police had never arrived." Id. at 694. In other words, police "'placed [the drivers and spectators] in no worse position than that in which [they] would have been had [the officers] not acted at all.'" *Id.*

*Koulta v. Merciez*, 477 F.3d 442 (6th Cir. 2007), further establishes that there is no affirmative act when the risk of a similar type of harm that ultimately occurs

exists before state intervention—even if the state actor directs the private actor to act, which then causes injury. In *Koulta*, a speeding drunk driver ran a red light and killed the driver of another vehicle. Minutes before the accident, police interviewed the drunk driver, who admitted to consuming alcohol. *Id.* at 444. Police did not cite the driver for having an expired license plate, did not conduct any investigation into the driver's driving record, and did not administer a sobriety test. Instead, police told the driver "to go home" and "ordered" the inebriated driver to leave, and thereby permitted her to drive away. Id. at 446. Minutes later, the crash occurred.

The plaintiff sued arguing that the officer's act of ordering the drunk driver to leave was an affirmative act establishing a state created danger claim. This Court disagreed. In finding no affirmative act, this Court concluded that the police officers' directive did not create or increase the risk of danger, which was that the drunk driver's "drinking and driving would injure someone." *Id.* at 446. The Court reasoned that the driver was already drinking and driving before the officer encountered the driver, so the risk of harm "pre-dated their arrival on the scene." *Id.* at 446. While "the officers were in a position to head off the tragedy that materialized minutes later," and they ordered the driver to leave, their conduct did not affirmatively increase a risk of harm, so the state created danger claim failed. *Id.* at 446–447. The same holds true here. While Defendants *may* have been in a position to head off the shooting, the risk of harm pre-dated their intervention, so they did not increase the

risk of harm. The shooting would have happened had Defendants not intervened at all. Additionally, in the cases cited above—which were all dismissed—the public officials encouraged and/or allowed known criminal behavior to begin or continue.

*Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356, 367 (6th Cir. 2012), is particularly instructive as it relates to allegations that a principal provoked a student to act by threatening discipline. In *Pahssen,* a principal met with a student after receiving complaints that the student had been sexually harassing his female classmate. The student had a long history of disciplinary problems, including several allegations of sexual harassment and assault. The principal ordered the student to stop harassing his female classmate. Following the meeting, the student sexually assaulted the female classmate. The plaintiff argued that, given this student's history of acting defiantly in response to authority, the principal's act "**provoked**" the student to commit the assault. Id. at 367. This Court rejected the argument:

> This argument disserves Appellant, vividly illustrating the difficult circumstances that Merrill faced when John failed to respond to the disciplinary measures that Merrill imposed. Indeed, if one follows Appellant's logic regarding John's defiant nature, Merrill officials should have feared that expelling John would further encourage his harassing behavior. We thus reject Appellant's "state-created danger" theory.

*Id.* Thus, even though the principal's actions of warning the violent student allegedly provoked him to act, this Court found that the principal's actions did not amount to a state created danger. **Again, any other result would create perverse incentives**

**by encouraging public officials to take no action whatsoever, as opposed to trying to address a perceived problem.**

This principle is further illustrated in two cases involving fatal school shootings. First, in *McQueen*, 433 F.3d 460, a student named Smith was well known to the school to have violent tendencies. These included "several incidents where he attacked other students, sometimes beating them up, another time stabbing them with a pencil." *Id.* at 462. Despite these prior violent acts, Smith was allowed to remain in school. On the morning of the shooting, the teacher left the classroom unsupervised, leaving Smith and other students behind. While the teacher was away, Smith fatally shot a classmate. Although the teacher took some action, leaving the class unsupervised despite Smith's known history of violent behavior, that 'act' did not satisfy the affirmative act element. *Id.* at 466-467. The Court reasoned that the danger to the victim was created by the student bringing a gun to school, and his preexisting behavioral issues. *Id.* at 466. So, the student "would have faced the danger of Smith drawing his gun and firing even if the [teacher] had not acted." *Id.* Therefore, the teacher did not create or increase the risk. *Id.*

Next, in *Walker v. Detroit Pub. Sch.*, 535 Fed. Appx. 461 (6th Cir. 2013), the school district combined two high schools, knowing that the schools had competing gangs. *Id.* at 462-463. Somewhat predictably, after the district brought the two gangs together, multiple fights erupted at school between the rival gangs, after which

weapons were often found. After one such fight, school employees sent the students involved back to class, rather than suspend them or call law enforcement. One gang member then shot multiple students killing one. *Id.* at 462. This Court found that the acts of bringing the rival gangs together in one building, and the manner in which the school officials intervened and sent the students back to class, were not affirmative acts. *Id.* at 466. This

Court reasoned that the potential for danger between the two rival gangs already existed before the school official's action. *Id.* at 466. Both of the above cases involved violence that was foreseeable, unlike the present lawsuits. Here, EC was never violent towards a student and had no disciplinary history. In *McQueen*, the student had physically assaulted students previously—including stabbing a student. In *Walker*, there was physical violence coupled with firearms preexisting the murder.

This Court has also confronted multiple cases where police were called to intervene in a pre-existing dangerous situation, such as a domestic dispute. In each of those cases, this Court has found no affirmative act, even in situations where the officer took some action that allegedly emboldened the suspect to act. This was because the risk of the danger that occurred already existed before police intervention. For example, in *Reilly v. Ottawa Cnty.,* No. 20-2220, 2021 WL 3929324, at *3 (6th Cir. Sept. 2, 2021), cert. denied sub nom. 142 S. Ct. 900, (2022), police responded to a domestic dispute where the boyfriend threatened to kill his

girlfriend, who later murdered the girlfriend after the police intervention. This Court found that the officers' interventions, which allegedly "emboldened" to act by not arresting the boyfriend, were not affirmative acts because the suspect already posed a danger of violence *before* police intervened. *Id.* at *6 (plaintiff did "not identify an affirmative act that created a danger to Rosemarie that did not exist before" officers' involvement).

Similarly, in *May v. Franklin Cty. Comm'rs*, 437 F.3d 579, 584-86 (6th Cir. 2006), officers responding to a domestic dispute, who allegedly "emboldened" the suspect to commit murder, did not commit an affirmative act because the officer did not expose the victim to a greater harm than that which already existed. *See also Brooks v. Knapp*, 221 Fed. Appx. 402, 407 (6th Cir. 2007). In *Culp v. Rutledge*, 343 F. App'x 128 (6th Cir. 2009), an officer's threat to arrest a known dangerous suspect, which allegedly prompted the suspect to commit a shooting, was not an affirmative act. *Id.* at 134-135. In *Ryan v. City of Detroit*, 698 Fed. Appx. 272 (6th Cir. 2017), an officer did not commit an affirmative act when intervening in a domestic dispute because the officer's "**actions at most returned the wife to the same level of danger she faced before the state action**." Id. at 283 (emphasis added.

In all of the above cases, the state officials took some action. Some of the alleged actions were to "order," "provoke" or "embolden" a violent suspect to act, which resulted in injury. *See Jones* (telling drivers to go ahead with drag race who

already prepared to race)*; see Koulta* (ordering drunk driver to leave, resulting in fatal accident); *see Pahssen* (provoking the student to sexually assault victim by threatening discipline); *see Culp* (threat to arrest suspect that allegedly prompted shooting). But those "acts" were not actionable because the risk of the type of harm that occurred already existed before state action. Thus, the state actors did not "directly" create or "greatly increase" the risk of a danger. As these cases illustrate, when the risk of the type of harm that ultimately occurs existed before state intervention, then there is no affirmative act. *See Wilson*, 3 F.4th at 858 ("[t]he key question, then, is 'not whether the victim was safer *during* the state action, but whether he was safer *before* the state action than he was *after* it.'"). This is because "the victim would have been in *about the same* or even greater danger even if the state officials had done nothing." *McQueen*, 433 F.3d at 466.

Based on the above, Plaintiffs' allegations here do not state a viable claim that Defendants "greatly increased" the danger of a school shooting. Rather, it is evident from Plaintiffs' pleadings that Oxford students were already exposed to the same threat of danger from E.C. that ultimately occurred *before* Defendants had any interaction with him. Thus, the shooting would have occurred had Defendants not tried to help at all.

As the district court found, "[a]ll facts indicate that E.C. came to school on November 30, 2021 [before Hopkins' alleged warning] prepared to commit a

shooting. The risk that E.C. would do so was 'a pre-existing danger.'" RE 142, Page ID # 2228. Plaintiffs allege that E.C. planned to carry out a school shooting several months before Defendants interacted with him. Plaintiffs further allege that before the Oxford Defendants were made aware of any issues with E.C., he had psychiatric distress, homicidal thoughts (which played out in mutilating animals) and had already privately threatened to shoot up the school. Plaintiffs also claim that, well before Defendants' involvement, E.C. made videos and kept journals describing "his plan to shoot up the school." Case No. 22-cv-11113, RE 6, Page ID # 79, ¶ 33. Plaintiffs claim that on the night before the shooting EC made a cryptic post on social media alluding to carrying out his plan to commit a school shooting the next day. **Plaintiffs next claim that E.C. wrote in his journal he would carry out the shooting on November 30.** *Watson,* **¶¶** 75-76. **Plaintiffs further assert that EC already brought a gun to school with him on November 30** *to carry out the school shooting that day***, before Hopkins or anyone spoke with him.** "[J]ust as the plaintiffs in *Cartwright* and *Bukowski* would have faced at least the same danger if the police had not acted," based on the above, students "would have faced the danger of [E.C.] drawing his gun and firing at [them] even if [Defendants] had not acted." *McQueen*, 433 F.3d at 466. E.C. planned the shooting for eight months, announced he would commit the shooting the night before it occurred, and then snuck the gun into school to execute his plan *before* meeting with Defendants. Thus, it cannot be

reasonably argued that Defendants created or **greatly** increased the risk of danger to Plaintiffs; that risk already existed.

If the officers in *Jones*, who encouraged drag racers to go through with a drag race that resulted in fatalities, or the officers in *Koulta*, who ordered a drunk driver to leave, did not commit affirmative acts because the danger that ultimately occurred existed before their actions, then Defendants here cannot be held liable because Plaintiffs admit that the danger of a shooting existed before Defendants' involvement. The shooting would have occurred had Defendants not tried to help at all. Defendants' alleged comment is not an affirmative act and the claim should be dismissed

### i. *Lipman, Nelson* and *Kallstrom* are distinguishable.

Plaintiffs argue that there is a question of fact as to whether Defendants' alleged warning to contact CPS is an affirmative act based on *Lipman v. Budish*, 974 F.3d 726 (6th Cir. 2020). *Lipman* is entirely distinguishable, as the assailant in *Lipman* did **not** have a specific plan to harm the victim before the state intervention.

*Lipman* relates to an act of retaliation in response to state action. In *Lipman*, a Children and Family Services official forced an abused child to report that her parents abused her in front of the parents *suspected of abuse*. The official did so knowing such acts would increase the risk of further abuse in retaliation. In fact, it

was "common-sense" that such an act would result in retribution against the child, which was "reflected in the…county's written policies prohibiting such" acts. *Id.* at 746. Predictably, after the official's act, the parents abused the child and she died. It was claimed that the officials' actions "incited [the parents] to kill" the child. *Id.* The defendants in *Lipman* even conceded that their actions increased the risk of harm to the minor. *Id.*

The Sixth Circuit found that *Lipman* "precisely track[ed] the facts of *Kallstrom* and *Nelson*," where "the private actors had **no desire to harm the plaintiffs before the state**" action. *Id.* at 746-747 (emphasis added). *Kallstrom* and *Nelson v. City of Madison Heights,* 845 F.3d 695 (6th Cir. 2017), are the narrow line of retaliation cases where police officers outed a confidential informant to a violent private actor and the private actor acted in retaliation as result of the disclosure. In *Kallstrom*, police officers released the identities of undercover officers to defense attorneys for gang members the undercover officers helped arrest. This disclosure of their identities specifically endangered the undercover officers and their families for acts of retaliation. The gang members did **not** have a plan to harm the officers before the disclosure. Rather, the gang members *only* learned of the undercover officers' identities because of the disclosure, and those officers were *only* endangered because of the disclosure. In *Nelson*, a confidential police informant was murdered after police released her identity to a drug dealer she informed on. The drug dealer did

**not** have a plan to harm the officer before the disclosure. Instead, the drug dealer *only* learned of the informants' report because the officers outed the informant. The drug dealer then murdered the informant in retaliation. The drug dealer *only* acted in retribution against the informants because of the officers' action. Those allegations are not made here.

The important factor distinguishing *Lipman, Nelson* and *Kallstrom*—the confidential informant retaliation cases—from this case is that in the three informant cases this Court found that "**the private actors had no desire to harm the plaintiffs before the state outed them as undercover officers or informants**." *Lipman,* 974 F.3d at 746 (emphasis added); *see McQueen*, 433 F.3d 460, 466 (in distinguishing *Kallstrom,* stated: "If the city [in *Kallstrom*] had not acted, then the attackers would not have access to this information and attacks would not be facilitated."). The officials' acts **created** the risk of retaliation. In other words, though the private actors were *generally* dangerous, the specific danger that happened–the retaliation–would not have occurred without the state official's act.

The opposite is true here. The shooting would have occurred even if Defendants had not acted. *McQueen*, 433 F.3d at 466. Plaintiffs have firmly established that EC planned to commit the *exact* act that ultimately occurred and was ready to carry out that plan before Defendants met with EC. Plaintiffs detailed the amount of preparation EC had undertaken for 8 months to carry out the exact type

of shooting that occurred *before* Defendants met with him. This is underscored by the fact that the night before the shooting **E.C. wrote in his journal and referenced on social media that he planned to commit a mass school shooting the next day**. Then E.C. brought a gun to school with him on the morning of November 30, 2021, before meeting with Defendants with the intent to shoot his classmates. Thus, this is not a case where "the private actors had no desire to harm the plaintiffs before the state" acted, and thus the risk of harm did not exist before state action, as in *Lipman, Nelson* and *Kallstrom. Lipman,* 974 F.3d at 746. Rather, this case precisely tracks *Jones*, *Koulta, McQueen, Walker, Bukowski, Cartwright, Pahssen*, and *May,* cases where the risk of harm that ultimately occurred was present before the state actor intervened and would have occurred in the absence of state action. E.C. planned to commit this same act regardless of Defendants' actions.

Stated plainly, no Sixth Circuit decisions—not *Lipman, Nelson* nor *Kallstrom*—have found a state created danger under the circumstances of this case, where a private actor announces his specific plan to commit violence before the state action, then follows through with that plan.

Additionally, this Court has acknowledged that the *Kallstrom* line of cases should be narrowly interpreted. *See Barber v. Overton*, 496 F.3d 449, 457 (6th Cir. 2007)("right we created in *Kallstrom* was exceeding[ly] narrow."). *Przybysz v. City of Toledo*, 746 F. App'x. 480, 483–84 (6th Cir. 2018), illustrates just how limited the

*Kallstrom* cases are. *Przybysz* is another confidential informant case. There, an informant disclosed the name of his drug dealer to police. Thereafter, an undercover officer made two buys from the dealer, which resulted in the dealer's arrest. After the dealer was released from custody, the dealer's associate then murdered the informant. The informant's family sued, arguing that the officer's action of arresting the dealer after the informant's report was an affirmative act that provoked the murder, citing *Nelson* and *Kallstrom*. But this Court found that "*Nelson* and *Kallstrom* are readily distinguishable from" *Przybysz,* Id. at 484, because the officers in *Nelson* and *Kallstrom* named the confidential informant by name, causing the death. This Court had never applied the state-created exception under the *Przybysz* circumstances, when the totality-of-the-circumstances helped a private actor correctly guess the informant's identity. *Id.* at 483. The substantive due process claims against the police officers were dismissed. *Id.* at 484.

Similarly, this Court has never found a state created danger under the circumstances of this case, where a violent actor already had such an advanced plan to carry out an act of violence *before* the state action. *Jones* and *Koulta* confirm that these circumstances do not present a state created danger. If the circumstances of *Przybysz* were too distinguishable from the *Kallstrom* cases for them to apply, then the *Kallstrom* cases are too distinguishable here as well.

### ii. Plaintiffs' argument leads to bad policy.

Accepting Plaintiffs' argument that Defendants' alleged warning violates the constitution would lead to bad policy. In substance, Plaintiffs argue that the counselor recognized the student may have mental health concerns and recommended that the parents seek outside counseling support for their son. When the parents resisted, the counselor impressed upon them the need to seek support. This is what you want a counselor to do.

If such action to help a distressed student can be a constitutional violation, that would dissuade counselors and social workers from suggesting the very type of mental health supports that a student may need—because "a 'failure to act is not an affirmative act under the state-created danger theory.'" *See Jones*, 438 F.3d at 691 Therefore, if Defendants can be found liable under these circumstances, then Defendants would have been better off not attempting to help at all. With teen suicide on the rise, dissuading officials from trying to help students is "neither reasonable nor desirable." *Cutlip*, 488 F. App'x at 118; *see Jackson*, 954 F.3d at 937 ("'imposing liability ... for acting in this manner would dissuade [school employees] from responding expeditiously' to future risks."); *see May*, 437 F.3d at 585–86 ("we decline to interpret the Due Process Clause in such a manner as to discourage law enforcement officers from responding to requests for assistance."); *see Brooks*, 221 F. App'x at 406 (same).

## 2. No "Conscience-Shocking" Behavior.

Plaintiffs' claims should also be dismissed because Plaintiffs cannot establish that Defendants acted with the "requisite degree of state culpability." *McQueen*, 433 F.3d at 464. Defendants' conduct must be "so 'egregious' that it can be said to be 'arbitrary in the constitutional sense'", such that it "shocks the conscience." *Ewolski*, 287 F.3d at 510. "[O]nly extreme misconduct will violate the clause." *Lewis*, 523 U.S. at 847.

"The [conscience shocking] standard has two parts. [1.] An official must 'be aware of facts from which the inference 'could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.' [2.] 'Having drawn the inference,' the official next must act or fail to act in a manner demonstrating 'reckless or callous indifference' toward the individual's rights. Given the call for caution in this area, our cases set demanding rules for both parts of this standard." *Jackson*, 954 F.3d at 935.

### i. No knowledge of *specific* risk of harm.

"[The school employee] must know of more than a *general* risk of harm. The [school employee] must know of the *specific* risk that later develops." *Jackson*, 954 F.3d at 933-934 (citation omitted) (emphasis in original). Stated differently, the school employee must know of a "risk of harm *of the type that actually happened*." *M.J.*, 1 F.4th at 451(emphasis in original).

Mere knowledge of facts from which an inference can be drawn is still not enough. The school employee "must also draw the inference" that the specific type of harm will actually occur from the facts known. *Jackson*, 954 F.3d at 933 (quoting *Ewolski*, 287 F.3d at 513). This is "a demanding standard." *Id*.

Illustrating this demanding standard, the Sixth Circuit found that actual knowledge of a student's violent propensities, which included stabbing another student, is insufficient to put the school employees on notice of a *specific* risk that the student would shoot other students. *See McQueen*, 433 F.3d at 466.

Consider again *McQueen*. Before the school shooting in *McQueen*, the assailant-student ("Smith") had been "involved in several incidents where he attacked other students, sometimes beating them up and other times stabbing them with a pencil." 433 F.3d at 462. This Court found that the teacher's knowledge of Smith's "sometimes violent behavior" was not enough to prove that she knew that Smith posed a specific risk of gun violence. *Id*. at 469. Based on just these facts, the teacher had no notice that Smith "would escalate from hitting with fists, feet, and pencils" to shooting with guns. *Id.* at 470. **This Court clarified that absent evidence the teacher knew Smith had a gun or would escalate his conduct from fist fights to gun violence, then the plaintiff could not show that the specific risk of harm was obvious to the teacher.** *Id.* Contrast *McQueen* with the present case. Here, there are no allegations suggesting that E.C. had previously engaged in any

physical violence of any kind at school. Similarly, there are no allegations that the school employees had any knowledge that E.C. previously harmed or attempted to harm any student either in or out of school. And it is undisputed that Defendants did not know E.C. had a gun or planned to commit an act of gun violence.

*Doe v. Jackson Local School District*, the case involving the sexual assault of a kindergartner by an older student, provides another example that knowledge of a student's propensity to endanger other students is not enough to satisfy the culpability standard. Instead, there must be knowledge of the end result. *See* 954 F.3d 925, 935 (6th Cir. 2020). Before the assault in *Doe*, the school district knew that the assailant, C.T., had a significant history of behavioral problems, including lighting matches on the school bus, bullying students, and preventing students from reporting his conduct. He had also been dishonest when confronted by school officials. While the school official "knew that C.T.'s poor judgment, bullying tendencies, and dishonesty had the potential to endanger students", the court found that "nothing about the 'kind and degree of risk' … suggested that C.T. also posed a risk of intentional sexual assault." *Id.* at 935. This Court reasoned, "our cases focus on the kind of *risk* known to the state actors because that will inform the kind of *response* the Constitution requires." *Id.* at 937. Again, the facts in *Doe* provided significantly more notice to school employees of the potential for harm, which is in stark contrast to the present situation. Here, EC had no disciplinary history or history

of violent behavior that would suggest he posed a potential danger to other students. *See also M.J.*, 1 F.4th at 451 (school officials' knowledge that security guard had been improperly handcuffing students did not inform them of the *specific* risk the guard would "violently throw[] students around a room.").

Here, nothing about what Defendants knew could have put them on notice that E.C. posed the *specific* risk of shooting multiple students. Unlike *McQueen*, there is no suggestion that E.C. had a *known* longstanding history of disciplinary issues, issues with other students, threatening behavior, or violence towards others. He did not. E.C. had never been disciplined for or claimed to have possessed a weapon of any kind. **There is also no allegation that any Defendants knew E.C. had a weapon in his possession that day or that he planned to commit an act of gun violence.** Plaintiffs actually argue that Defendants did **NOT** know E.C. had a gun. This alone should lead to a dismissal. *See McQueen*, 433 F.3d at 470.

What was known was very limited. E.C. *once* looked at ammunition on his cell phone during hunting season. E.C. was *once* seen watching a violent video game on his phone. Such conduct is no different than an average 15-year-old watching Fortnite or Call of Duty videos. And E.C. one time drew odd depictions and wrote statements of depression on one assignment. The drawings and statements do not make a direct threat against another student, group of students, or anyone else. All told, these Defendants are alleged to have had very limited individual knowledge of

an interest in violent depictions, similar to any student with an interest in horror and action movies, or video games. Yet nothing about the kind and degree of risk from a limited interest in violent depictions suggested that E.C. also posed the *specific* risk of shooting his classmates that day.

Certainly, questioning E.C.'s story that his drawing related to a video game or that he may have some self-harm potential is not the same as knowing E.C. planned to shoot his classmates. The responses to such knowledge are markedly different. *See Jackson*, 954 F.3d at 937 (knowledge of specific risk is important to inform the appropriate response).

Importantly, Plaintiffs do not contend that any of the Defendants "actually drew the inference" from these limited facts that E.C. posed a risk of shooting students. *Jackson*, 954 F.3d at 934 ("official must 'be aware of facts…"**and he must also draw the inference.**")(emphasis added). That fact alone should lead to the dismissal of Plaintiffs' lawsuit.

"[T]his case is easier than *McQueen," Jackson*, 954 F.3d at 935, another fatal school shooting case that was dismissed. "There, the school official actually knew of the shooter's history of intentional violence against other students. As noted, 'in the months leading up to the shooting, [he had been] involved in several incidents where he attacked other students, sometimes beating them up and other times stabbing them with a pencil.' [*McQueen*,] 433 F.3d at 462. Yet these prior assaults

did not put his teacher on notice that he would bring a gun to school and shoot a classmate. *Id.* at 469–70." Id. Conversely, here, E.C. had no history of violence towards others. His interest in action videos is beyond commonplace. E.C. had not threatened anyone. And no one knew E.C. had a gun. If the school district employees in *McQueen* did not draw the inference that the assailants in those cases would shoot their classmates based on a known history of violence towards students, then certainly the comparatively limited knowledge that Defendants possessed in this matter would not lead them to any inference of impending violence.

### ii. No conscience shocking response to known risk of *specific* outcome.

If Plaintiffs can prove that Defendants were aware of the *specific* risk of harm, then the Court determines whether the official's response to that known specific risk was "conscience shocking." *Schroder*, 412 F.3d at 731. Conscience-shocking conduct is defined as conduct "so inspired by malice or sadism rather than a merely careless or unwise excess of zeal that it amounted to a brutal and inhumane abuse of official power literally shocking to the conscience." *Lillard,* 76 F.3d at 725 (case involving teacher's direct physical assault of a student).

Further, where the official chooses a response motivated by a "legitimate governmental purpose," then the challenged conduct will generally not be found conscience shocking. *Jackson*, 954 F.3d at 933–34. For example, this Court has

repeatedly found that even in extreme cases such as a case involving a school teacher's direct physical abuse of a student, which included strapping a disabled student to a gurney and gagging the student with a bandana, did not shock the conscience, because the abuse was committed for a legitimate reason, namely student discipline. *Domingo v. Kowalski*, 810 F.3d 403 (6th Cir. 2016); *see also Gohl v. Livonia Public Schools*, 836 F.3d 672 (6th Cir. 2016) (same).

*Jackson*, 954 F.3d 925, the case involving the sexual assault of the kindergarten student, also illustrates this principle. In that case, the court found that relocating an older student next to a much younger student in response to behavioral issues, which allowed the sexual assault to occur, was not conscience shocking. *Id.* at 935. The Court reasoned that the bus driver "did not make this seating change for some 'arbitrary reason' designed to increase the risks of harm to Minor Doe." *Id.* "[The bus driver] was instead 'motivated by a countervailing, legitimate governmental purpose,'" which was to keep a closer eye on the assailant. *Id.* The bus driver chose a course of action based on the known risk before her (match lighting), not based on an unknown risk that had yet to come to pass (sexual assault). *Id.* The court recognized that as will often be the case in retrospect, more could have been done when implementing this discipline. But at most, the failure to take additional precautions suggests negligence, which falls well short of establishing the required callous disregard for the safety of the victim. *Id.*

*McQueen*, the case involving a school shooting, provides a clear example why Defendants response as alleged in these lawsuits is not conscience shocking. 433 F.3d 460. In *McQueen,* the court found that it was not conscience shocking to leave a student with known violent tendencies unsupervised in a class with other students, which allowed the shooting to occur. The Sixth Circuit concluded that the teacher's decision to leave the student unsupervised in light of the student's known history of violence was not enough to satisfy the high standard of a state created danger. *Id.* at 469-470. This Court found that absent evidence the teacher knew or believed the student had a gun, the plaintiff could not show that the risk of such a violent attack by Smith was so obvious that the teacher had to have known about it. *Id* at 470.

*Bukowski*, is particularly instructive here. In *Bukowski*, a mentally disabled 19-year-old woman was coaxed to travel out-of-state to visit a much older man she met online, who raped her. When the woman's parents discovered she had left their home, they contacted police, who ultimately found the woman at the rapist's home. Police took the woman into custody and promised to detain her until her parents arrived. While in custody, the woman falsely told police that the rapist was her boyfriend and that her parents abused her. During the interview, police noted that the woman was obviously mentally disabled. Despite that obvious disability, police accepted the woman's false story. So, police returned the woman to the man who lured her from home and ultimately raped her again. The woman's parents sued over

the officers' decision to return her to the rapist. The Sixth Circuit dismissed plaintiff's state created danger claim. This Court noted that even if there were sufficient state action here, which there was not, the officers' actions were not conscience shocking. *Id.* at 710. This Court acknowledged that police knew they were questioning a mentally disabled young woman under suspicious circumstances. But this Court was satisfied that the mentally disabled woman provided an explanation to police that left them ignorant of many facts that were only apparent in hindsight. Based on what the mentally disabled young woman shared, police "would not have been aware of facts from which it could be deduced that a substantial risk of harm existed." *Id.* at 711.

In this case, Defendants did not act in a conscious shocking manner. Defendants tried to help a student they had limited information about, but who appeared to be depressed and may have needed counseling.

While the district court found that discovery was necessary to decide the conscience shocking element, this Court in *McQueen* found that there must be proof or allegations that the teacher knew the student had a gun. 433 F.3d at 470. There is no such allegation here. To the contrary, Plaintiffs *argue* that Defendants did **not** know E.C. had a gun. So, no discovery is necessary.

Weigh Defendants' responses against what was known. Defendants knew less than what was known in *McQueen* and *Jackson*, where the student-perpetrators had

a known history of behavioral problems and violence against classmates. This even included a prior stabbing in *McQueen*. Here, Defendants did **not** know of any behavioral or disciplinary problems, threats of violence, or, importantly, that E.C. had a gun. *See McQueen*, 433 F.3d at 470 (**absent evidence the teacher knew or believed the student had a gun cannot prove a state created danger**). That fact alone should lead to dismissal. *Id.*

Defendants instead knew that EC once looked up images of bullets during hunting season, watched a violent video like many 15-year-olds, and drew images on a math assignment indicative of some depression.

Defendants' response to these reports was appropriate in light of what was known. According to Plaintiffs, Defendants did **not** ignore the situation. They did the opposite and tried to help the distressed student based on limited information, not knowing what exactly was wrong. Plaintiffs admit that upon receiving these reports, "[Defendants] spoke extensively with E.C., **who denied that there were any problems**." Although E.C. confirmed he did not have any issues, still "[Defendants] called E.C.'s parents and asked them to come to school for a meeting." During the meeting, Plaintiffs claim that Defendants informed the parents he would call CPS if they did not obtain professional counseling for E.C. within the next 48 hours. This is a far greater response than the police officers in *Bukowski*, when the mentally disabled woman falsely informed police she was safe. Rather than

simply let E.C. return to class based alone on his assurance, as the officers in *Bukowski* did when they returned the mentally disabled woman to her rapist based on her statements, Defendants still followed up with E.C.'s parents so he could get professional counseling.

Far from conscience-shocking, the responses here are appropriate under the circumstances, even hypervigilant. The type and nature of the complaints are not uncommon in a high school setting. There were also no threats made to harm anyone, and no one was aware that E.C. had a gun. Immediately upon receiving the report, Defendants met with E.C., called his parents, and strongly urged mental health support. And similar to *Jackson*, these Defendants had a legitimate governmental purpose behind their actions, namely trying to appropriately counsel a student. *See Hunt,* 542 F.3d at 542 (finding that officials' actions when acting with a legitimate governmental purpose is not conscience shocking).

Here, it cannot be disputed that Defendants were concerned for the well-being of the student and sought the assistance of his parents. This is indicative of counselors acting in furtherance of their most essential role in responding to a common scenario, an apparently depressed teenager in the age of Covid. That is not conscience shocking conduct. *See Jackson*, 954 F.3d at 937. Again, if Defendants can be found liable under these circumstances, then Defendants would have been better off not attempting to help at all. Because a failure to act would not lead to any

liability here. *See Jones*, 438 F.3d at 691 ("a 'failure to act is not an affirmative act under the state-created danger theory.'"). The lesson from the Oxford shooting should not be to dissuade counselors and social workers from attempting to help troubled students.

### 2. DEFENDANTS DID NOT VIOLATE "CLEARLY ESTABLISHED" CONSTITUTIONAL RIGHTS.

Even if a question could be raised as to whether the Defendants' actions violated Plaintiffs' constitutional rights, that is not enough to impose liability. Defendants are entitled to qualified immunity if their conduct does not violate a "clearly established" constitutional right. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). The Sixth Circuit recently found that the clearly established test is "a tough standard [to meet]" *Ashford v. Raby*, 951 F.3d 798 (6th Cir. 2020). A "clearly established" right is one that is "sufficiently clear that *every* reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2011).

The "clearly established" analysis starts with examining United States Supreme Court and Sixth Circuit case law for similar cases. *Stewart v. City of Euclid, Ohio*, 970 F.3d 667, 675 (6th Cir. 2020). The facts of the prior cases must be sufficiently similar to clearly establish the law. Recently, the Supreme Court once again reminded us "not to define clearly established law at a high level of

generality." *City of Tahlequah, Oklahoma v. Bond*, 142 S. Ct. 9, 11 (2021). For example, merely recognizing that the Fourth Amendment bars the police from using excessive force is too general and will "not clearly establish that force was excessive on a particular occasion." *Beck v. Hamblen Cty. Tennessee*, 969 F.3d 592, 599 (6th Cir. 2020).

Rather, "the legal principal must clearly prohibit the official's conduct in the **particular circumstances** before him. The rule's contours must be so well defined that it is clear to a reasonable official that his conduct was unlawful in the situation he confronted. This requires a high degree of specificity." *Kollaritsch v. Michigan State Univ.*, 944 F.3d 613, 626 (6th Cir. 2019). The Sixth Circuit also elaborated that "the fact pattern of the prior case must be 'similar enough to have given "fair and clear warning to officers" about what the law requires.'" *Beck*, 969 F.3d at 599.

The high degree of similarity in fact patterns required is illustrated in *Tahlequah*, a case involving the shooting death of a suspect. 142 S. Ct. 9. In *Tahlequah*, the Court drew a distinction between the details of two arrests, calling them "dramatically different" for purposes of the qualified immunity analysis:

> The officers in *Allen* responded to a potential suicide call by sprinting toward a parked car, screaming at the suspect, and attempting to physically wrest a gun from his hands. Officers Girdner and Vick, by contrast, engaged in a conversation with Rollice, followed him into a garage at a distance of 6 to 10 feet, and did not yell until after he picked up a hammer. We cannot conclude that *Allen* "clearly established" that their conduct was reckless or that their ultimate use of force was

unlawful.

*Tahleuah*, 142 S.Ct. at *12. The above illustrates the high degree of specificity that is required to define clearly established law—i.e. the then-existing precedent must be so well defined that it is clear to any reasonable school district's employee that Defendants' conduct was unlawful in the situation they confronted.

Here, there are no Supreme Court or Sixth Circuit Opinions finding that a school district employees' actions in attempting to look to the well-being of a student under these circumstances amounted to this high threshold of conduct. The only two cases decided by the Supreme Court and Sixth Circuit related to school shootings are *Walker* and *McQueen*, repeatedly referenced above. Both found that the school district employees' conduct ***did not violate substantive due process rights*** by returning known violent students to class, and in one case, leaving the student unsupervised.

Additionally, the Sixth Circuit's holdings in similar cases established there is no constitutional violation here. Based on this Court's decisions in *Jones*, *Koulta*, *McQueen, Walker* and the police cases, it is not clearly established that Defendants violated substantive due process rights by taking some action against a private actor who ultimately commits an act of violence, when that private actor *already* posed a significant risk committing the type of harm that ultimately occurred *before* Defendants' involvement. In those cases, this Court found there was no state created

danger where the state actor took action to order or emboldened a private actor to commit an act that resulted in injury because a similar risk of harm existed *before* the state action. This case falls in line with the *Jones* decision and establishes there was no constitutional violation.

Similarly, based on *McQueen* and *Jackson*, it is not clearly established that Defendants knew of the specific risk of harm or that they acted in a conscience shocking manner. *McQueen* stated that absent evidence that the defendants knew the suspect had a gun and intended to use it, the plaintiff could not establish a state created danger claim. 433 F.3d at 470. No cases state the opposite.

*Lipman, Nelson* and *Kallstrom* do not clearly establish a constitutional right in the circumstances presented here. The *Kallstrom* cases are factually distinguishable in a material way. In those cases, the private actor did not pose a risk to commit the same type of harm that later occurred before state action. The opposite is true in this case. Moreover, as this Court has recognized, those cases are narrowly interpreted. *Przybysz*, 746 F. App'x at 483–84 (6th Cir. 2018). In *Przybysz*, this Court granted qualified immunity to the defendants in another confidential informant case, when the manner in which the state actor disclosed the informant's identity was different than the way the identities were disclosed in the *Kallstrom* cases. *Id*. at 484.

Thus, it is not clearly established that Defendants' response in discussing these concerns with E.C., meeting with the parents regarding these concerns, and

strongly encouraging counseling for E.C. violates any students' constitutional rights. This is especially true where E.C. posed a risk to carry out the same type of danger that ultimately occurred *before* Defendants attempted to assist. As a result, Defendants are entitled to immunity.

## <u>CONCLUSION</u>

Based on Plaintiffs' allegations, Defendants-Appellants' actions did not create or greatly increase the risk that this shooting would occur, as that risk already occurred. Nor did they know of the specific risk of harm. Defendants-Appellants request that this Court dismiss the substantive due process claim.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant-Appellants

DATED: January 2, 2024

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to 6th Cir. P. 32(a), the undersigned counsel certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32. The brief was prepared in Microsoft Word 2010, using a Times New Roman 14 pt font. Microsoft Word 2010 has a function that calculates the number of words in a document. According to that function, there are 12,802 words in this brief.

/s/TIMOTHY J. MULLINS
GIARMARCO, MULLINS & HORTON, PC
Attorney for Defendant-Appellants

DATED: January 2, 2024

## CERTIFICATE OF ELECTRONIC SERVICE

TIMOTHY J. MULLINS states that on January 2, 2024, he did serve a copy of **DEFENDANTS-APPELLANTS' BRIEF ON APPEAL** via the Sixth Circuit Court electronic transmission.

/s/TIMOTHY J. MULLINS

GIARMARCO, MULLINS & HORTON, PC

Attorney for Defendant-Appellants

101 W. Big Beaver Road, 10th Floor

Troy, MI 48084-5280

(248) 457-7020

tmullins@gmhlaw.com

P28021

# RELEVANT DISTRICT COURT DOCUMENTS

Pursuant to Sixth Circuit Rule 29, Defendants-Appellants designate the following filings in the United States District Court for the Eastern District of Michigan for inclusion in the Record on Appeal:

*Franz et al. v. Oxford Community School District et al.*, **No. 21-cv-12871 (E.D. Mich.):**

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
|---|---|---|---|
| First Amended Complaint | 1/7/2022 | 29 | 408-513 |
| Answer | 1/21/2022 | 31 | 516-572 |
| Affirmative Defenses | 2/4/2022 | 36 | 683-687 |
| Common Order | 12/12/2023 | 105 | 1755-1756 |
| Defendants' Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) | 12/22/2023 | 107 | 1758-1865 |
| Plaintiffs' collective Response to Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) | 1/26/2023 | 119 | 1915-1988 |
| Defendants' Reply in Support of Motion for Judgment on the | 2/9/2023 | 123 | 2014-2081 |

| | | | |
|---|---|---|---|
| Pleadings pursuant to Fed. R. Civ. P. 12(c) | | | |
| Opinion granting in part and denying in part Defendants' Motion for Judgment on the Pleadings pursuant to Fed. R. Civ. P. 12(c) | 5/12/2023 | 142 | 2219-2245 |
| Defendants' Notice of Appeal | 6/1/2023 | 148 | 2268-2297 |
| Hearing Transcript from Defendants' Motion to Dismiss held on 3/21/2023 | 6/13/2023 | 151 | 2333-2378 |

***Asciutto et al v. Oxford Community School District et al*., No. 22-cv-10407 (E.D. Mich.):**

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
|---|---|---|---|
| First Amended Complaint | 6/2/2022 | 21 | 150-192 |
| Answer | 6/28/2022 | 33 | 228-258 |
| Order Regarding Dismissal of Plaintiffs' Claims | 5/12/2023 | 61 | 327 |

***Beausoleil v. Oxford Community School District et al*., No. 22-cv-11250 (E.D. Mich.):**

| Description of | Filed Date | Record Entry | Page ID |
|---|---|---|---|

| Record Entry | | No. | |
|---|---|---|---|
| Complaint | 6/7/2022 | 1 | 1-19 |
| Answer | 8/10/2022 | 20 | 58-76 |
| Order Regarding Dismissal of Plaintiffs' Claims | 5/12/2023 | 43 | 135 |

*Cunningham et al. v. Oxford Community School District et al.,* **No. 22-cv-11398 (E.D. Mich.):**

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
|---|---|---|---|
| Complaint | 6/23/2022 | 1 | 1-19 |
| Answer | 9/7/2022 | 12 | 48-65 |
| Order Regarding Dismissal of Plaintiffs' Claims | 5/12/2023 | 31 | 115 |

*Mueller et al. v. Oxford Community School District et al.,* **No. 22-cv-11448 (E.D. Mich.):**

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
|---|---|---|---|
| Complaint | 6/28/2022 | 1 | 1-67 |
| Answer | 9/6/2022 | 40 | 198-250 |
| Order Regarding Dismissal of Plaintiffs' Claims | 5/12/2023 | 72 | 1331 |

*Myre, et al. v. Oxford Community School District, et al.*, No. 22-cv-11113 (E.D. Mich.):

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
|---|---|---|---|
| Complaint | 5/26/2022 | 6 | 70-108 |
| Answer | 6/24/2022 | 17 | 142-169 |
| Order Regarding Dismissal of Plaintiffs' Claims | 5/12/2023 | 45 | 237 |

*Ossege v. Oxford Community School District et al.*, No. 22-cv-11251 (E.D. Mich.):

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
|---|---|---|---|
| Complaint | 6/7/2022 | 1 | 1-32 |
| Answer | 7/12/2022 | 21 | 71-103 |
| Order Regarding Dismissal of Plaintiffs' Claims | 5/12/2023 | 47 | 169 |

*St. Juliana et al v. Oxford Community School District et al.*, No. 22-cv-10805 (E.D. Mich.):

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
|---|---|---|---|
| Complaint | 4/14/2022 | 1 | 1-52 |
| Answer | 5/27/2022 | 18 | 93-124 |

| Order Regarding Dismissal of Plaintiffs' Claims | 5/12/2023 | 53 | 221 |
| --- | --- | --- | --- |

***Watson et al. v. Oxford Community School District***, **et al., 22-cv-11959 (E.D. Mich.):**

| Description of Record Entry | Filed Date | Record Entry No. | Page ID |
| --- | --- | --- | --- |
| Complaint | 8/21/2022 | 1 | 1-63 |
| Answer | 2/1/2023 | 20 | 135-174 |
| Order Regarding Dismissal of Plaintiffs' Claims | 5/12/2023 | 23 | 177 |