Case Nos. 23-1483/23-1481/23-1489/23-1490/23-1491/23-1492/23-1493/
23-1496/23-1560/23-1561/23-1563/23-1564/23-1565

# UNITED STATES COURT OF APPEALS
# FOR THE SIXTH CIRCUIT

| | |
|---|---|
| JEFFREY FRANZ, et al. | (23-1483/23-1563) |
| STEVE ST. JULIANA, et al. | (23-1487/23-1561) |
| WILLIAM MYRE, et al. | (23-1489/23-1565) |
| KYLIE OSSEGE | (23-1491/23-1564) |
| MATTHEW MUELLER, et al. | (23-1493/23-1560) |

      Plaintiffs-Appellees Cross-Appellants,

| | |
|---|---|
| NICHOLETTE ASCUITTO, et al. | (23-1484) |
| NICOLE BEAUSOLEIL, et al. | (23-1490) |
| SANDRA A. CUNNINGHAM, et al. | (23-1492) |
| JARROD WATSON, et al. | (23-1496) |

      Plaintiffs-Appellees,

v.

OXFORD COMMUNITY SCHOOL DISTRICT, et al.

      Defendants,

| | |
|---|---|
| NICHOLAS EJAK, et al. | (23-1483/23-1563) |
| | (23-1487/23-1561) |
| | (23-1489/23-1565) |
| | (23-1491/23-1564) |
|     Defendants-Appellants Cross-Appellees | (23-1493/23-1560) |
|     Defendants-Appellants | (23-1481; 23-1490, 23-1492; 23-1496) |

---

Appeal from the United States District Court
Eastern District of Michigan
Case Nos. 2:21-cv-12871; 22-11398; 22-10407; 22-11250;
22-11448; 22-11113; 22-11251; 22-10805; 22-11959

# PLAINTIFFS' JOINT BRIEF
## AS APPELLEES AND CROSS-APPELLANTS

SECOND BRIEF

PITT, McGEHEE, PALMER, BONANNI & RIVERS PC

/s/ Kevin M. Carlson
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Beth M. Rivers (P33614)
Kevin M. Carlson (P66704)
Danielle Y. Canepa (P82237)
*Counsel for St. Juliana Plaintiffs*
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.

/s/ Robert G. Kamenec (w/p)
GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON (P65351)
ROBERT G. KAMENEC (P35283)
MILICA FILIPOVIC (P80189)
*Attorneys for Franz et al. Plaintiffs*
19390 West Ten Mile Road
Southfield, MI 48075
P: (248) 355-5555 / F: (248) 355-5148
r.kamenec@fiegerlaw.com
m.filipovic@fiegerlaw.com

DEBORAH GORDON LAW

/s/ Deborah L. Gordon  (w/p)
Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
*Attorneys for Ossege Plaintiff*
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

GIROUX PAPPAS TRIAL ATTORNEYS, P.C.

/s/ Andrew J. Laurila  (w/p)
Robert M. Giroux (P47966)
Andrew J. Laurila (P78880)
Matthew Klakulak (P60220)
*Attorneys for Asciutto & Vackaro Plaintiffs*
28588 Northwestern Hwy., Suite 100
Southfield, MI 48034
(248) 531-8665
alaurila@greatMIattorneys.com
mklakulak@greatMIattorneys.com

MUELLER LAW FIRM

/s/ Wolfgang Mueller (P43728) (w/p)
WOLFGANG MUELLER (P43728)
*Attorney for Beausoleil Plaintiff*
Attorney for Arthur Plaintiff
41850 W. 11 Mile Rd. #101
Novi, MI 48375
P: (248) 489-9653
wolf@wolfmuellerlaw.com


JOHNSON LAW, PLC

/s/ Ven Johnson (w/p)
Ven Johnson (P39219)
Kanwarpreet S. Khahra (P80253)
Christopher Desmond (P71493)
*Counsel for Myre Plaintiffs*
535 Griswold St., Suite 2632
Detroit, MI 48226
(313) 324-8300
vjohnson@johnsonlaw.com
kkhahra@venjohnsonlaw.com
cdesmond@venjohnsonlaw.com

SOMMERS SCHWARTZ, P.C.

/s/ Matthew L. Turner (w/p)
Matthew L. Turner (P48706)
Lisa M. Esser (P70628)
John M. Malone (P81838)
Counsel for Mueller Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
T: (248) 355-0300
F: (248) 936-2158
lesser@sommerspc.com
mturner@sommerspc.com
jmalone@sommerspc.com


FLOOD LAW PLLC

/s/ Todd Flood (w/p)
Todd. F. Flood (P58555)
*Counsel for Watson Plaintiffs*
155 W Congress St Ste 603
Detroit, MI 48226-3267
P: 248-547-1032
tflood@floodlaw.com

# TABLE OF CONTENTS

Index of Authorities ............................................................................. iii

Corporate Disclosures ......................................................................... v

STATEMENT IN SUPPORT OF ORAL ARGUMENT ..................................... vi

STATEMENT OF JURISDICTION ON CROSS-APPEAL .............................. 1

STATEMENT OF ISSUES ..................................................................... 1

STATEMENT OF THE CASE .................................................................. 2

    A. Facts ........................................................................................ 3
    B. Procedural History ..................................................................... 7

SUMMARY OF THE ARGUMENT ......................................................... 10

ARGUMENT ...................................................................................... 12

I.     THE DISTRICT COURT CORRECTLY HELD THAT HOPKINS
       AND EJAK ARE NOT ENTITLED TO QUALIFIED
       IMMUNITY AT THE PLEADING STAGE FOR THEIR
       PLAUSIBLE AFFIRMATIVE ACTS. ............................................... 12

       A. Threatening To Report E.C.'s Parents to CPS In His Presence
          Was An Affirmative Act. ........................................................... 12

          1. Defendants Offer No Authority To Support Dismissal
             At The Pleadings Stage Where Plaintiffs Allege Specific
             Actions by School Officials That Plausibly Increased
             The Risk of Danger .......................................................... 13

          2. Plaintiffs plausibly allege Hopkins and Ejak created
             or increased the risk of harm to Plaintiffs. ..................... 29

          3. Defendants' policy argument for dismissal again asks the
             Court to draw factual conclusions in their favor. ........... 30

B. With Knowledge that E.C. Was Fantasizing About Shooting People, That He Had Access to Firearms and Knew How to Use Them, That He Was Aware of His Own Uncontrollable Thoughts and Was Pleading for Help, and That He Was In An Acute Mental Health Crisis, Defendants Knew Their Actions Specifically Risked the Possibility of a Shooting at Oxford High School..........................32

C. Plaintiffs' Right to Be Free From Affirmative Acts by School Officials That Rendered Them More Vulnerable to a School Shooting Was Clearly Established at The Time of the Shooting............................40

D. Dismissal Based on Qualified Immunity Is Inappropriate At The Pleadings Stage.................................................................................42

E. The District Court Correctly Held That Dismissal Based on Qualified Immunity Is Inappropriate At The Pleadings Stage Given Plaintiffs' Plausible State-Created Danger Claims. ..........................................43

II. THE DISTRICT COURT ERRED WHEN IT DISMISSED STATE-CREATED DANGER CLAIMS WHERE DEFENDANTS CONCEALED THE CREDIBLE THREAT OF A SCHOOL SHOOTING AND INSTEAD RETURNED E.C.'S BACKPACK CONTAINING THE GUN AND DIRECTED E.C. TO ATTEND CLASS. ................................................................................44

A. The District Court Erred By Drawing Conclusions Of Fact And Construing The Facts Against Plaintiffs At The Pleadings Stage.................................................................................44

B. The District Court Incorrectly Disregarded Sixth Circuit Case Law On State-Created Danger In Schools At The Pleading Stage. ........45

C. Returning the Gun to E.C. and Directing Him To Class Was An Affirmative Act.................................................................................49

D. Concealing Credible Plans To Commit A School Shooting From Law Enforcement And School Authorities Is An Affirmative Act..........54

CONCLUSION .................................................................................56

# INDEX OF AUTHORITIES

**Cases**

*Bartynski v. City of Highland Park, Michigan*, No. 21-10049, 2022 WL 390892, at
*4 (E.D. Mich. Feb. 8, 2022)................................................................33

*Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001) ...........................................55

*Briscoe v. Potter*, 355 F. Supp. 2d 30, 44–45 (D.D.C. 2004) ..............................55

*Brooks v. Knapp*, 221 Fed. Appx. 402 (6th Cir. 2007)......................................21

*Buddenberg v. Weisdack*, 939 F.3d 732, 738–39 (6th Cir. 2019) ........................42

*Bukowski v. City of Akron*, 326 F.3d 702 (6th Cir. 2003).................................18

*Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998) ..................................33

*Culp v. Rutledge*, 343 F. App'x 128 (6th Cir. 2009) .......................................24

*D.N. ex rel. Nelson v. Snyder*, 608 F.Supp.2d 615, 627 (M.D. Pa. 2009)...............55

*DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989)......15

*Doe v. Jackson Loc. Sch. Dist. Bd. Of Ed.*, 954 F3d. 925, 933 (6th Cir. 2020).......33

*Est. of Sanchez v. City of Saginaw*, No. 20-CV-11685, 2020 WL 7122085, at *5
(E.D. Mich. Dec. 4, 2020) ...............................................................23

*First Nat'l Bank of Salem, Ohio v. Hirsch*, 535 F.2d 343, 346 (6th Cir. 1976).......10

*Guertin v. State*, 912 F.3d 907, 923 (6th Cir. 2019)........................................33

*Huffman v. Speedway LLC*, 621 F. App'x 792, 795 n.2 (6th Cir. 2015) .................10

*In re Ferro Corp.*, 511 F. 3d 611, 616–617 (6th Cir. 2008) .....................................1

*Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006)......................................23

*Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998) ..........................41

*Koulta v. Merciez*, 477 F.3d 442, 446 (6th Cir. 2007).....................................23

*Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 891 (W.D. Tex. 2019) ..................55

*M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 449 (6th
Cir. 2021) .............................................................................11, 16

*M.S. by Covington v. Hamilton Cty. Dept. of Ed.*, 756 Fed. Appx. 510, 516 (6th Cir.
2018) ............................................................................... 17, 51

*May v. Franklin Cty. Comm'rs*, 437 F.3d 579 (6th Cir. 2006)..............................21

*McQueen v. Beecher Community Schools,* 433 F.3d 460 (2006)............................19

*Meyers v. Cincinnati Bd. of Educ.*, 343 F. Supp. 3d 714, 723 (S.D. Ohio 2018) ....54

*Moderwell v. Cuyahoga Cnty., Ohio*, No. 20-3879, 2021 WL 1897949 (6th Cir.
May 12, 2021)..............................................................................43

*Myers v. City of Centerville, Ohio*, 41 F.4th 746, 758 (6th Cir. 2022)....................42

*Nelson*, 845 F.3d 695, 700–03 (6th Cir. 2017).............................................41

*Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356 (6th Cir. 2012).........................24

*Sanchez v. City of Saginaw, MI, et al.*, Case No. 23-1593 (6th Cir. June 27, 2023)23

*Stiles v. Grainger Cnty., Tenn.*, 819 F.3d 834, 855 (6th Cir. 2016).........................20

*U.S. v. Holloway*, 740 F.2d 1373, 1382 (6th Cir. 1984)...........................................10

*United States v. Lanier*, 520 U.S. 259, 271 (1997)...................................................42

*Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)............................................42

*Wilson v. Gregory*, 3 F.4th 844 (6th Cir. 2021)........................................................22

**Other Authorities**

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. §§ 1331, 1343 ..............................................................................................1

42 U.S.C. § 1983 ..........................................................................................................1

U.S. Const. amend. XIV, § 1 ......................................................................................15

**CORPORATE DISCLOSURE**

Pursuant to Fed. R. App. P. 26.1 and 6th Cir. R. 26.1, the Plaintiffs/Cross-Appellants/Appellees are individuals, not corporations, and accordingly have no financial interest to disclose under 6th Cir. R. 26.1(b)(1). Cross-Appellants/Appellees and their counsel are aware of no publicly owned corporation that is a party to this appeal and has a financial interest in the outcome.

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

This case raises complex issues of federal law and important questions about school district accountability for preventable school shootings. To permit the Cross-Appellants/Appellees to present their positions fully, we request that the Court allocate at least 20 minutes per side to oral argument in the consolidated cases.

## STATEMENT OF JURISDICTION ON CROSS-APPEAL

Exercising jurisdiction over Plaintiffs' constitutional claims pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331, 1343, the district court entered an order dismissing certain claims without prejudice on May 12, 2023. (*Franz*, R. 142, Opinion & Order, Page ID # 2225-2233). A dismissal without prejudice is a final order for appeal purposes. *In re Ferro Corp.*, 511 F. 3d 611, 616–617 (6th Cir. 2008). Cross-Appellants timely filed respective notices of appeal on June 13 and June 14, 2023. This Court has appellate jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF ISSUES

1.      Whether Defendants are entitled to qualified immunity at the pleading stage where the law was clearly established on November 30, 2021, that Plaintiffs have a right to be free from affirmative acts by school officials that render them more vulnerable to a shooting and Defendants committed multiple affirmative acts creating or increasing the danger of a shooting.

2.      Whether the district court erred in dismissing state-created danger claims at the pleading stage of the case by finding that Defendants did not commit affirmative acts that increased the risk of harm to Plaintiffs when Defendants affirmatively concealed the credible threat of a school shooting, returned the gun to the shooter's custody, and directed him to attend class.

## STATEMENT OF THE CASE

This case is about a preventable school shooting. Defendants Hopkins and Ejak had repeated contact with the shooter in the 24 hours leading up to his assault on Oxford High School on November 30, 2021, in which four children were killed and seven people injured. Plaintiffs are the parents of children who were killed and survivors of the shooting.[1] Hopkins and Ejak admitted to law enforcement they knew that E.C. was homicidal when they met with him hours before the shooting.[2] They knew his behavior indicated acute psychiatric distress, that he had access to guns, that he drew images of gun violence on his schoolwork with the words, "blood everywhere," and literally pleaded, in writing, "the thoughts won't stop. Help me."

Alerted by teachers, Defendants pulled E.C. out of class. They interviewed E.C. and secured his backpack, containing his 9mm handgun. At that moment, any preexisting danger was fully neutralized. Defendants recognized all the warning signs of a school shooting, but instead of maintaining the situation of safety, they

---

[1] Plaintiffs have filed nine separate actions, consolidated here under the lead case, *Franz v. Oxford Comm. Sch. Dist.*, Case No. 2:21-cv-12871 (E.D. Mich., filed Dec. 9, 2021). *See* Order Consolidating Cases (Doc. 30, Case No. 23-1483 (Consolidating Case No. 23-1483/23-1484/23-1487/23-1489/23-1490/23-1491/23-1492/23-1493/23-1496/23-1560/23-1561/23-1563/23-1564/23-1565)).

[2] Independent Report on the Shooting At Oxford High School On November 30, 2021, https://oxfordresponse.com/wp-content/uploads/2023/10/FINAL-REPORT-OCS_Investigation.pdf (last accessed 2/21/24) ("Guidepost Report"), R. 157-4, Page ID # 2572, p. 28.

instead created a new deadly situation and substantially increased the danger to Plaintiffs by: (A) threatening, in E.C.'s presence, to report his parents to CPS if they did not provide him with immediate counseling; (B) concealing E.C.'s credible plans to commit a school shooting from law enforcement and school authorities; and (C) returning the unsearched backpack with the gun to E.C. and directing him to class. Two hours later, E.C. opened fire.

## A. Facts [3]

In the months leading up to the shooting at Oxford High School, E.C. was known to school staff for concerning behavior and clear psychiatric distress. *St. Juliana*, R.1, Page ID # 11, ¶23. Throughout November 2021, students and parents reported concerns about violent threats to the school, but OHS personnel maintained a policy of concealing and minimizing these. *Id.*, Page ID # 12-14, ¶¶31-37.

The day before the shooting, November 29, 2021, E.C.'s Spanish teacher emailed Defendant Nicholas Ejak (Dean of Students) and Pam Fine (Restorative Practices Coordinator) that E.C. was looking up bullets on his phone. R. 1, Page ID # 15, ¶43. This email was forwarded to Defendant Shawn Hopkins, who was E.C.'s

---

[3] Defendants recite the facts selectively from Plaintiffs' nine separate complaints. For clarity and because the Joint Plaintiffs cited to the *St. Juliana* Complaint (2:22-cv-10805, R. 1, Page ID # 1-52) for the facts in their Joint Response before the district court, Plaintiffs do so here as well. Apart from the facts, this brief cites to the lead case (*Franz*, 2:21-cv-12871) for all lower court proceedings unless specified otherwise.

counselor. *Id.* ¶44. Hopkins and Fine met with E.C. the same day. *Id.* ¶¶45-47. E.C. told them he went to a gun range the previous weekend for target practice and firearms were a family hobby. *Id.* ¶48. Thus, there is no dispute Defendants knew prior to the shooting that E.C. had access to guns. Page ID # 22, ¶97. The morning of the shooting, on November 30, 2021, at 8:30 am, Defendant Hopkins received another email about E.C. His English teacher reported E.C. was watching a video of a shooting on his phone. *Id.* Page ID # 15, ¶54.

Less than a half hour later, Defendants learned E.C. was writing pleas for help and drawing images of a handgun and a bullet-riddled body in class. R. 1, Page ID # 16, ¶55. At 8:59 am, E.C.'s math class participated in a test review, on which E.C. drew a picture of his Sig Sauer 9mm handgun and wrote: "The thoughts won't stop. Help me." To the right, he drew a person with two gunshot wounds: one in the chest and one in the abdomen, with blood coming from the mouth. Beside this, he wrote "blood everywhere" and drew a shell casing or bullet. Below, E.C. drew a laughing/crying emoji. Finally, he wrote: "My life is useless" and "The world is dead." *Id.* ¶55. EC's teacher saw the drawing and immediately reported it to Hopkins and Ejak. *Id.*

Based on E.C.'s worksheet, the prior reports that he was researching bullets and watching videos about shootings, and the repeated reports of threats to school safety in November, Ejak and Hopkins had actual concern for E.C.'s safety and

recognized these facts established a credible threat of a school shooting. R. 1, Page ID # 18, ¶65. They brought E.C. into the counseling office. *Id.*, Page ID # 17, ¶58. Ejak retrieved E.C.'s backpack from the classroom, which contained the handgun and forty-eight rounds of ammunition. *Id.* ¶60. E.C. told Hopkins the video and drawings were for a video game. *Id.* ¶¶63, 67. Hopkins knew E.C. was lying and said: "This does not sound like a video game." Page ID # 18-19, ¶66-68.

E.C. then described upsetting things that had happened recently in his life. R. 1, Page ID # 19, ¶69. Hopkins determined that E.C. was suicidal. *Id.* ¶ 70. Hopkins asked E.C. if he was a threat to himself or others. *Id.* ¶ 71. E.C. responded, "I'm not going to do anything." *Id.* ¶ 73. Hopkins admitted knowing this was not true and concluded E.C. was in fact a threat to himself. *Id.* They also knew E.C. had access to guns. *Id.*, Page ID # 22, ¶97.

Hopkins and Ejak knew E.C. presented a specific threat; they concluded he was suicidal, that he was lying about whether he was a threat to himself and others, and they called E.C.'s parents for an intervention. R. 1, Page ID # 19-20, ¶¶74-82. Hopkins and Ejak knew or should have known that E.C. had expressed homicidal ideation and that he presented a substantial risk of deadly harm to others. *Id.*, Page ID # 21, ¶92.

Waiting for E.C.'s parents to arrive, Hopkins stayed with E.C. in the office because he knew it was not safe to leave him alone. R. 1, Page ID # 20, ¶83. Hopkins

told E.C.'s parents why he was concerned about E.C., and his conclusion E.C. was suicidal. *Id.*, Page ID # 21, ¶86.

Hopkins gave E.C.'s family a list of resources and stated E.C. needed to start counseling as soon as possible, "today, if possible." R. 1, Page ID # 21, ¶87. E.C.'s parents stated they had to return to work and could not get E.C. treatment that day. *Id.* ¶88. Hopkins threatened that he wanted E.C. seen for counseling within 48 hours, and if they did not obtain counseling, he would report them to CPS. *Id.* ¶89. This increased the danger by placing direct pressure on E.C., who was in state of suicidal and homicidal ideation and experiencing a mental health crisis. *Id.*, Page ID # 25, ¶¶111-112. The meeting subjected E.C. to shame, fear, humiliation, and embarrassment. *Id.* ¶113. The threat to call CPS and remove E.C. from his home exacerbated his distress, and created and increased the danger that E.C. would act on his violent ideation. *Id.* ¶114. Hopkins and Ejak knew this meeting worsened E.C.'s condition. Page ID # 22, ¶96.

Hopkins knew from meeting with E.C. the day before that he had access to firearms. Hopkins and Ejak also knew E.C. had access to guns, that he was searching for bullets and watching shooting videos the day before, and both saw his math worksheet depicting graphic gun violence. *Id.* ¶¶97-98. Both also knew that E.C. was suicidal and that he posed both a threat to himself and others. *Id.* ¶¶99, 101.

Ejak and Hopkins wrote E.C. a hall pass, gave him the unsearched backpack containing the firearm and the ammunition, and directed him to attend his third hour class. R. 1, Page ID # 23, ¶102. Hopkins was so concerned that he used the school's attendance reporting system to remotely track E.C. and check if he was "present" for his third and fourth period classes. *Id.* ¶103.

After sending E.C. to class, Hopkins and Ejak took the additional step of concealing the credible threat of a school shooting from law enforcement, the school safety liaison officer, E.C.'s teachers, and other school officials, thus increasing the danger of a violent incident. R. 1, Page ID # 23, ¶104; Page ID # 26, ¶117; Page ID # 33, ¶140; Page ID # 37, ¶154.

Less than two hours after Hopkins and Ejak sent E.C. to class, E.C. took his backpack into a bathroom and emerged with his loaded handgun. R. 1, Page ID # 24, ¶105. He opened fire, killing four students, wounding six students, and wounding a teacher.

## B. Procedural History

On May 12, 2023, the district court entered an Opinion & Order Granting in Part and Denying in Part Defendants' Motion for Judgment on the Pleadings (*Franz*, R. 142, Opinion & Order, Page ID # 2225-2233).[4] That Order dismissed Plaintiffs'

---

[4] Defendants filed a single motion for judgment on the pleadings for all of the Oxford Cases in *Franz*, No. 21-cv-12871. (R. 107, Page ID # 1758-1841). Plaintiffs filed a

state-created danger claims on all grounds and against all Defendants except claims against Defendants Shawn Hopkins, Nicholas Ejak, and Oxford Community Schools, to the extent those claims are based on allegations that Hopkins and Ejak committed affirmative acts that increased the risk of harm to Plaintiffs by threatening, in E.C.'s presence, to report his parents to CPS if they did not provide him with counseling. In the same Opinion and Order, the district court ruled that Hopkins and Ejak are not entitled to qualified immunity based on those allegations. (R. 142, Page ID # 2240-2241). The district court entered a corresponding Order Regarding Dismissal of Plaintiffs' Claims in each of the consolidated cases (*See, e.g., St. Juliana*, Order, R. 53, Page ID # 221).

Defendants-Appellants appeal the district court's denial of qualified immunity regarding the allegation of threatening, in E.C.'s presence, to report his parents to CPS if they did not provide him with counseling. (R. 148, Notice of Appeal, Page ID # 2269-2270). This Court should affirm the denial of qualified immunity on that ground because the district court correctly held the pleadings state viable claims for violations of clearly established law.[5]

---

joint response (R. 119, Page ID # 1915-1988); Defendants filed a reply (R. 123, Page ID # 2014-2043).

[5] Appellees in this consolidated action are: *Franz*, Case No. 23-1483 (Lead Case); *Asciutto, et al.*, Case No. 23-1484; *St. Juliana*, Case No. 23-1487; *Myre, et al.*, Case No. 23-1489; *Beausoleil*, et al., Case No. 23-1490; *Ossege v. Oxford Community Sch. Dist., et al.*, Case No. 23-1491; *Cunningham*, Case No. 23-1492; *Mueller, et al.*, Case No. 23-1493; *Watson, et al.*, Case No. 23-1496.

Certain Plaintiffs also cross-appeal the district court's ruling that Hopkins and Ejak did not commit plausible affirmative acts that increased the danger to Plaintiffs when Defendants (A) concealed E.C.'s credible plans to commit a school shooting from law enforcement and school authorities; and (B) gave E.C. his backpack with the gun and directed E.C. to class, despite knowing he was homicidal and presented an immediate risk of gun violence.[6]

New facts became available after the parties noticed their appeals. These include admissions from Hopkins and Ejak about their knowledge that E.C. was indeed homicidal, the specific school policies for which the District failed to provide training, and Defendants' interference with a third party investigation into the causes of the shooting. *See* FN 3, *supra*. On February 27, 2024, Plaintiffs filed a Motion for Relief from Judgment, which is currently pending before the district court, based on (1) facts disclosed through an independent investigation of Guidepost Solutions concerning the facts leading to the shootings at Oxford High School on November 30, 2021; (2) Defendants' concealment of facts and obstruction of the investigation;

---

[6] Plaintiffs in five out of nine actions filed cross-appeals and are the Cross-Appellants in this Court: *Mueller*, Case No. 23-1560 (Notice of Cross-Appeal, R. 76, Page ID # 1367-1372); *St. Juliana*, Case No. 23-1561 (Notice of Cross-Appeal, R. 58, Page ID # 260-265); *Franz*, Case No. 23-1563 (Notice of Cross-Appeal, R.152, Page ID # 2379-2384); *Ossege*, Case No. 23-1564 (Notice of Cross-Appeal, R. 51, Page ID # 205-209); *Myre, et al.*, Case No. 23-1565 (Notice of Cross-Appeal, R. 52, Page ID # 1296-1301).

and (3) the factual allegations in Defendant Oxford Community Schools' declaratory judgment action against its insurance carrier. (R. 142, Plaintiffs' Joint Motion for Relief from Opinion & Order and For Leave to File Amended Complaints, *Franz* R. 157, Page ID # 2432-2455). Plaintiffs base this appeal on the facts before the district court at the time of its ruling but make the Court of Appeals aware of this recent procedural development.[7]

## SUMMARY OF THE ARGUMENT

As Appellees, Plaintiffs respond that the district court correctly held Hopkins and Ejak acted affirmatively to increase the risk of danger to Plaintiffs when they threatened to report E.C.'s parents to CPS in his presence, this threat plausibly increased the risk that E.C. would commit the shooting, and therefore Defendants are not entitled to qualified immunity on that allegation. *Franz*, R. 142, Page ID # 2232. The district court correctly held that Hopkins and Ejak committed an affirmative act that increased the risk of harm to Plaintiffs because a court "can

---

[7] Generally, "the filing of the notice of appeal…deprives the district court of jurisdiction to act in matters involving the merits of the appeal." *U.S. v. Holloway*, 740 F.2d 1373, 1382 (6th Cir. 1984). Motions seeking relief under Rule 60(b) or under Rule 54(b) are within the district court's jurisdiction to consider even during the pendency of an appeal. *Huffman v. Speedway LLC*, 621 F. App'x 792, 795 n.2 (6th Cir. 2015). "If [the district] court indicates that it will grant the motion, the appellant should then make a motion in [the court of appeals] for a remand of the case in order that the District Court may grant the motion[.]" *Huffman,* 621 F. App'x at 795 n.2 (quoting *First Nat'l Bank of Salem, Ohio v. Hirsch*, 535 F.2d 343, 346 (6th Cir. 1976) (internal quotation marks omitted). If the district court denies the *Hirsch* motion, "the appeal will be considered in regular course." *Id.*

reasonably infer, as [it] must at this stage of the litigation," that Plaintiffs were safer before the threat and the conversation pushed E.C. to his breaking point. *See M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of Educ.*, 1 F.4th 436, 449 (6th Cir. 2021). Plaintiffs' right to be free from affirmative acts by school officials that rendered them more vulnerable to a shooting was clearly established law at the time of the shooting. *Lipman v. Budish*, 974 F.3d 726, 749 (6th Cir. 2020).

Plaintiffs cross-appealed from the district court's Opinion and Order Granting in Part and Denying in Part Defendants' Motion for Judgment on the Pleadings because the court incorrectly dismissed claims based on additional affirmative acts committed by Defendants that also plausibly increased, created, or recreated the risk that E.C. would commit the shooting. Contrary to the standard of review for a motion to dismiss state-created danger claims, *see M.J.*, 1 F.4th at 449, the district court erred by drawing factual conclusions and construing the facts in favor of Defendants to find that (A) Defendants did not commit an affirmative act when they returned the backpack with the gun to E.C. and instructed him to go to class, and (B) they did not commit an affirmative act when they concealed E.C.'s credible plans to commit a school shooting from law enforcement and school authorities. R. 142, Opinion & Order, Page ID # 2225, 2228-2230. The district court erred when it dismissed claims based on those affirmative acts, and that error requires reversal.

**ARGUMENT**

**I. THE DISTRICT COURT CORRECTLY HELD THAT HOPKINS AND EJAK ARE NOT ENTITLED TO QUALIFIED IMMUNITY AT THE PLEADING STAGE FOR THEIR PLAUSIBLE AFFIRMATIVE ACTS.**

The district court correctly recognized one of the affirmative acts committed by Hopkins and Ejak.[8] It correctly ruled that Plaintiffs' right to be free from state-created danger by school officials was clearly established at the time of the shooting, precluding qualified immunity based on Plaintiffs' pleadings. This Court should affirm the district court's denial of qualified immunity for Hopkins and Ejak.

**A. Threatening To Report E.C.'s Parents to CPS In His Presence Was An Affirmative Act.**

The district court correctly held that "[a]s a matter of pleading, it is plausible that a state official's statements can increase the risk of harm by prompting a private actor to commit violence." *Franz*, R. 142, Page ID # 2231 (citing *Lipman*, 974 F.3d at 744). In *Lipman*, this Court held the plaintiffs asserted a plausible state-created danger claim by alleging that caseworkers interviewed a young woman about her abuse in the presence of her abusers without removing the woman from her abusers' household, where subsequent continued abuse resulted in the woman's death. *Lipman*, 974 F.3d at 744. Reasoning that "[o]n a motion to dismiss, [the Court] must draw all reasonable inferences in favor of Plaintiffs when assessing whether the facts

---

[8] As Plaintiffs-Cross Appellants detail below, the district court erred by dismissing two further affirmative acts committed by Defendants. *See infra*, Section II.

in their complaint demonstrate a state-created danger," this Court concluded it was reasonable to infer that "interviewing [the victim] in front of her alleged abusers and asking about the source of her injuries increased her risk of further abuse." *Id.* at 746-747.

Applying *Lipman*, the district court found it reasonable to infer that when Hopkins and Ejak threatened to report E.C.'s parents to CPS in his presence if they did not provide him with immediate counseling, this threat increased the risk that E.C. would act on his violent ideas: "Plaintiffs have plausibly alleged that Hopkins and Ejak increased the risk that a mentally unstable teenager—suspected of harboring violent thoughts—would harm others when they threatened his parents with this imminent ultimatum in that teenager's presence." *Franz*, R. 142, Page ID # 2232. Defendants thereby committed an affirmative act that increased the risk of harm to Plaintiffs.

    1. <u>Defendants Offer No Authority To Support Dismissal At The Pleadings Stage Where Plaintiffs Allege Specific Actions by School Officials That Plausibly Increased The Risk of Danger</u>

Defendants make several arguments on appeal, each of which fail. First, they argue that Defendants did not commit an affirmative act because E.C. was already planning the shooting. This argument assumes that the Court should construe the facts in Defendants' favor and distorts Sixth Circuit law governing state officials. Second, Defendants argue that Hopkins and Ejak did not "*greatly* increase the risk

13

of harm" as required for a violation of Plaintiffs' substantive due process rights. But the degree to which Defendants created or increased the risk is, at most, a fact issue for discovery and trial. Third, Defendants argue that finding a plausible affirmative act on these pleadings would discourage public officials from attempting to intervene before a suspected school shooting. The district court correctly rejected this argument, holding that it raises a factual question that requires a full record. If anything, Defendants' conduct here is a lesson in what not to do, as the Guidepost Report has revealed, and as would be established through discovery and trial. *See* Guidepost Report, R. 157-4, Page ID # 2585 ("[T]he training of OHS faculty, staff, and students on threat assessments was deficient."); Page ID # 2586, p. 460 (finding that on the day of the shooting, Defendants knew that the Shooter's drawings and writings on his schoolwork that day "suggest[ed] not suicide, but homicide."); Page ID # 2586-2587, p. 460-61 (Concluding: "[i]t is not a close call: the Shooter's concerning behaviors and statements at the very least might suggest physical violence or a threatening situation" and Hopkins and Ejak had "the last best chance for the shooting to have been averted[,]" but they "decided to allow the Shooter to return to class.").

Defendants argue that because E.C. was planning a school shooting, this preexisting danger precludes any relevant action by Defendants that could have created or increased the danger to Plaintiffs. They appeal to assert an error of law,

but reveal in their briefing that causation here is fact-intensive: "Defendants did not commit an 'affirmative act' when they allegedly advised E.C.'s parents they would contact CPS if they did not get their son mental health counseling, because it is well documented that E.C. already planned to commit the exact harm that ultimately occurred." (First Brief, Doc: 42 Page: 33). Defendants rely on a distortion of Sixth Circuit law and a request to construe the facts in their favor.

First, Defendants argue incorrectly that a state-created danger claim is unavailable as a matter of law if danger preexisted the state official's actions. "[N]o state can deprive a person of life, liberty, or property without due process." U.S. Const. amend. XIV, § 1. "[I]n certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989). To assert a state-created danger claim, a plaintiff must allege: (1) "an affirmative act by the state which either created or increased the risk that [the plaintiff] would be exposed to an act of violence by a third party," (2) "a special danger to [them] wherein the state's actions placed [them] specifically at risk, as distinguished from a risk that affects the public at large," and (3) they must show that the state was aware of the "substantial risk of serious harm" and responded in a way that was "conscience shocking." *M.J.*, 1 F.4th at 449 (citations omitted).

E.C.'s plan or fantasy to commit a shooting does not reduce Defendants'
liability. There is no dispute some preexisting danger existed before E.C. interacted
with Hopkins and Ejak. There is no dispute that some level of premeditation
occurred. E.C. entered the school with a firearm and drew images of a shooting on
his schoolwork that morning. *St. Juliana*, R. 1, Page ID # 16, ¶55, Page ID # 60. But
contrary to Defendants' position, this Court has repeatedly recognized affirmative
acts when officials create, exacerbate, or recreate a preexisting criminal danger.
Defendants' brief studiously avoids analyzing this Court's most recent cases on state-
created danger in schools. In *M.J. by & through S.J. v. Akron City Sch. Dist. Bd. of
Educ.*, 1 F.4th 436 (6th Cir. 2021), a man entered a school posing as a police officer,
detained and handcuffed several children with disabilities, and verbally and
physically assaulted them. The man unquestionably entered the school with this
plan. This Court held the plaintiff alleged a plausible affirmative act sufficient to
state a claim for a state-created danger where a teacher called his mother and then
handed the phone to the fake officer, who spoke to the mother and then proceeded
to detain and abuse her son. This Court considered it a "close question" whether this
constituted an affirmative act and therefore construed the allegations in favor of the
plaintiff: "We can reasonably infer, as we must at this stage of the litigation, that
W.H. was safer before [teacher] handed [the fake officer] the phone because [he]
may have used the opportunity to convince [the mother] that he was a police officer

with authority to handcuff her son." *M.J.*, 1 F. 4th at 449. The fake officer's premeditated criminal plan to assault children at school did not alter the plausibility that the teacher's actions made the situation more dangerous. Here too, we "can reasonably infer, as we must at this stage of the litigation," that Plaintiffs were safer before Hopkins and Ejak met with E.C. and his parents because the meeting may have convinced E.C. to carry out his plan. *See* 1 F. 4th at 449.

This Court applied the same approach in another recent school case, *M.S. by Covington v. Hamilton Cty. Dept. of Ed.*, 756 Fed. Appx. 510 (6th Cir. 2018). There, this Court ruled plaintiffs stated a claim where a school principal instructed her students to board a school bus despite knowing that the bus driver was a dangerous driver. *Id*. at 516. Holding that the plaintiffs properly alleged a state-created danger, this Court rejected the school district's argument that the principal "merely returned the students to a risky status quo." *Id.* at 516. This Court distinguished the principal's actions from cases like *DeShaney* where defendants "played *no* part in creating the danger" (emphasis added) and treated the affirmative act as a fact issue that was adequately pled because the plaintiffs had identified conduct by the principal that went beyond mere inaction: "whether the principal's act increased the danger to the students is precisely what is at issue." *Id.* at 516-517. The same rule applies here. This is not a case where officials "played no part in creating the danger" and merely

served as bystanders who failed to know or failed to act. *See M.S.*, 756 Fed. Appx. at 516-517.

Hopkins and Ejak did not simply see the warning emails about E.C. and then proceed with their day, taking no further action. They pulled E.C. from class, secured his firearm, spoke with him at length, and sent him back to class with his gun after threatening to report his parents to CPS in his presence. "[W]hether the[se] act[s] increased the danger to the students is precisely what is at issue." *M.S.*, at 517 (finding plausible affirmative acts by school official where school bus driver's dangerous driving preexisted principal's instruction to students to ride the dangerous bus). Here the district court correctly rejected Defendants' argument that a preexisting danger precludes affirmative acts by state officials as a matter of law.

Defendants' primary authorities are nearly all from suits against police, arise from a summary judgment posture, and predate the more recent authorities for our Circuit governing state-created danger in schools. This Court has already distinguished a number of Defendants' authorities as irrelevant to school cases. For instance, Defendants cite *Bukowski v. City of Akron*, 326 F.3d 702, 709 (6th Cir. 2003) to argue that "merely returning a person to a situation with a preexisting danger" is not an affirmative act. (First Brief, Doc: 42, Page: 34). *Bukowski* affirmed summary judgment, reasoning a police officer's act of taking custody of a disabled woman from an abusive suspect, and then returning her to the suspect who

subsequently raped her, was not an affirmative act where the same danger existed before police intervened. In 2018, in *M.S.*, this Court expressly distinguished *Bukowski* from pleadings against school officials. Not only was *Bukowski* decided at a later procedural posture than this case, but in *Bukowski*, the officers returned the victim to her home in response to her "own wishes,"[9] and they "did not have any knowledge of the dangers facing her." *M.S.*, 756 Fed. Appx. at 517 (quoting *Bukowski*, at 709). In contrast, in this case and in *M.S.*, Plaintiffs "allege[] that the [school officials] instructed [E.C.] to [return to class] and that the [school officials] w[ere] fully aware of the dangers they faced." *M.S.*, 756 Fed. Appx. at 517. This awareness of danger before the officials' action establishes an affirmative act at the pleadings stage. *See id.*

Likewise, in *McQueen*, another summary judgment decision, this Court concluded that merely leaving students unsupervised was not an affirmative act because the "[t]his danger existed irrespective of [teacher's] location." *McQueen v. Beecher Community Schools,* 433 F.3d 460, 466 (2006). In *McQueen,* it did not matter whether the teacher was inside or outside of the classroom because the student had a firearm regardless of her location. Here, the danger was not present

---

[9] *Ryan v. City of Detroit* is distinguishable for the same reason. 698 Fed. Appx. 272, 283 (6th Cir. 2017) (no affirmative act when police detained and released violent husband who shot his wife, where plaintiff told officers that she did not want them intervening).

"irrespective" of Ejak and Hopkins' conduct. They knew the shooter was suicidal and had access to guns, they had custody of the firearm and custody of E.C., and they therefore had "the last best chance" to maintain the safety and security of that situation instead of handing E.C. his backpack and directing him back to class after threatening his family. And unlike the teacher in *McQueen*, who had no warning that her student was armed with a gun, 433 F.3d at 469–470, Ejak and Hopkins knew E.C. was pleading for help, was fantasizing about gun violence as depicted in graphic detail on his math worksheet, that he had access to firearms, and they knew enough not to believe E.C. when he claimed he was not a threat to himself or others. *St. Juliana*, R. 1, Page ID # 18-19, ¶¶65-73. Even lesser warnings to the school officials in *McQueen* sufficed to state a plausible claim and proceed to discovery.

Another case cited by Defendants, *Stiles v. Grainger Cnty., Tenn*., 819 F.3d 834, 855 (6th Cir. 2016), is a pure failure to act case unlike the facts here. In *Stiles*, decided at summary judgment, the plaintiffs asserted pure failures to act ("failing to punish students" and "failing to refer assaults to police") and offered "no explanation or evidence of how these actions increased DS's exposure to peer harassment." *Id*. at 855. Here, Plaintiffs explicitly allege Defendants' threats during E.C.'s mental health crisis increased his distress and thereby increased the risk of a shooting.[10]

---

[10] As discussed in Plaintiffs' Cross-Appeal, Defendants did more than "fail to refer assaults to police"; they deliberately concealed a known threat of gun violence. This is another affirmative act establishing state-created danger.

*May v. Franklin Cty. Comm'rs*, 437 F.3d 579 (6th Cir. 2006) was also decided at summary judgment after discovery. There, police officers who departed a scene of domestic violence and took no further steps were not liable for a state-created danger. 437 F.3d at 584-86. Unlike in *May*, here Plaintiffs allege Defendants took affirmative acts that changed the status quo from one of safety—with E.C. secure in the counseling room, speaking with a counselor, and separated from his firearm—to one of danger when they handed E.C. his backpack with the gun and directed him to attend class after threatening to report his parents to CPS. Plaintiffs should have the chance to establish these facts through discovery just as the plaintiff did in *May*.

*Brooks v. Knapp*, 221 Fed. Appx. 402 (6th Cir. 2007) is another pure failure-to-act case: "the plaintiffs base[d] their claims on the officers' failure to take more effective steps to incapacitate [the abusive husband]" and "the failure of the officers to arrest [him]." *Id.* at 406. Here, unlike *Brooks*, Plaintiffs allege the opposite of a mere "failure to act." Defendants had secured E.C. in the office, where no further affirmative acts were required to preserve a status quo of safety. Defendants then directed E.C. to attend class, gave him the backpack containing his gun and bullets, threatened to report his parents to CPS, and hid the credible threat of a school shooting.[11]

---

[11] Defendants have argued that some actions, like Defendants' decision not to search E.C.'s backpack or alert law enforcement, are mere "failures to act." This argument is misleading. In *M.S.*, the district's affirmative acts (instructing children to board

21

In *Wilson v. Gregory*, 3 F.4th 844 (6th Cir. 2021), the Sixth Circuit did not "reach the issue of whether any conduct by the [defendant officers] violated [the suicide victim's] constitutional rights[,]" and it did not decide the scope of a state-created danger beyond the context of "suicide by someone not in official custody." This is not a suicide in custody case, and *Wilson* is therefore unpersuasive here.

In *Cartwright v. City of Marine City*, another summary judgment decision outside of the school context, this Court concluded from a complete factual record that "the 'parking lot of an open convenience store'—was not more dangerous than the place where [police] had picked [plaintiff] up—the 'shoulder of a dark, foggy, two-lane highway." 336 F.3d 487, 493 (6th Cir. 2003). Whereas the comparative danger was undisputed in *Cartwright*, here the comparative danger before and after Defendants' affirmative acts is the critical dispute of fact that requires a complete

---

the bus of a dangerous driver) were also accompanied by acts of "doing nothing" to intervene or warn students. *M.S.* illustrates why certain decisions *not to act*, coupled with other affirmative acts, can render an affirmative act *more dangerous* in the context of the state's prior failure, and establish state-created danger. As the district court stated here: "What is of record are the allegations that Hopkins and Ejak—aware of facts indicating E.C. presented an imminent risk—acted affirmatively to increase that risk without attending to the appropriateness of preventing E.C. from acting out in the immediate future." R. 142, PageID # 2235. Here, sending E.C. back to class was preceded by Defendants' decision (which Plaintiffs say was an affirmative act and Defendants say was just an omission) to not search his backpack. These facts, taken together, are sufficient to allege that the sum of Defendants' actions created or exacerbated the danger to Plaintiffs.

record and likely a jury determination because "whether [the defendants'] act increased the danger to the students is precisely what is at issue." *M.S.*, *supra* at 517.

In *Jones v. Reynolds*, 438 F.3d 685, 691 (6th Cir. 2006), encouraging a drag race that resulted in a spectator's death was not an affirmative act because the drag race started before the police encouragement. "When a victim bears some responsibility for the risks she has incurred, it is even more difficult to say the 'state' has 'created' the 'danger' to her by its affirmative acts." *Id.* at 694.[12] Unlike *Jones*, here Plaintiffs played no role in creating the danger and the criminal act began after Defendants acted.

In *Koulta v. Merciez*, 477 F.3d 442, 446 (6th Cir. 2007), police did not create or increase the danger where the suspect was already driving drunk that night, and the police did not require her to drive; they only told her to "go home." *Id.* at 446. And while police knew she had consumed a bottle of liquor, they did not know she had consumed a second along with prescription medication. Unlike the officers in *Koulta*, here Defendants knew E.C. was a danger to himself and others yet instructed him to go to class. This case is more analogous to *Est. of Sanchez v. City of Saginaw*, No. 20-CV-11685, 2020 WL 7122085, at *5 (E.D. Mich. Dec. 4, 2020), appeal filed in *Sanchez v. City of Saginaw, MI, et al.*, Case No. 23-1593 (6th Cir. June 27, 2023).

---

[12] *Draw v. City of Lincoln Park*, 491 F.3d 550, 555-556 (6th Cir. 2007) followed the same reasoning.

There, although the intoxicated driver posed a pre-existing danger before traffic stop, officers could be found liable by recreating the danger when they directed him to get back in his car and drive home. The court denied summary judgment, finding a question of fact whether "Plaintiffs were safer sitting in the deactivated, driverless, parked car than they were after Defendants ordered them to go home in the car with a drunk driver." *Id.* at *9-10. A jury could find the same here: with E.C. safe in the counseling office, separated from his backpack with the gun, the danger of a shooting was neutralized, no longer inevitable, and completely ceased. Then Defendants recreated the danger by threatening him and returning E.C. to class despite knowing he was fantasizing about shooting people and had access to guns.

Defendants also rely on *Culp v. Rutledge*, 343 F. App'x 128 (6th Cir. 2009), another appeal following summary judgment. There the plaintiffs argued that officers increased the risk of abuse by an ex-boyfriend by failing to act on plaintiff's police report and claiming they would arrest the abuser, which caused the victim to tell the abuser's brother she had made a police report, triggering retaliation. *Id.* at 136. This Court affirmed summary judgment, finding mere "inaction" and "attenuated" causation. *Id.* The pleadings here are very different.

Defendants also cite *Pahssen v. Merrill Cmty. Sch. Dist.*, 668 F.3d 356 (6th Cir. 2012), where plaintiff alleged a principal's threat of discipline increased the danger that the student would assault plaintiff. *Id.* at 367. But the particular facts

make a difference to evaluating risk—which highlights why dismissal on the pleadings is improper. Defendants here faced a 15-year-old child they knew to be in the midst of an acute mental health crisis. They knew E.C. was suicidal and posed an immediate threat to himself and others. That is wholly different from a routine disciplinary meeting for a student with ongoing disciplinary problems. Further, the principal in *Pahssen* was directing a student to comply with school rules against sexual assault—an entirely different type of statement than threatening to call CPS in front of a highly distressed child. *Pahssen* is yet another summary judgment opinion that is factually dissimilar and procedurally irrelevant to Plaintiffs' pleadings.

As these cases show, Defendants' authorities are both older and factually dissimilar from the most recent cases in our Circuit governing state-created danger in schools at the pleading stage, where this Court has found plaintiffs asserted plausible affirmative acts even where danger preexisted school officials' involvement. *See M.J.*, 1 F.4th at 449 (6th Cir. 2021) (premediated criminal assault of schoolchildren by man posing as police officer did not preclude plausible affirmative act when teacher allowed the fake officer to convince a student's mother he was legitimate); *M.S.*, 756 Fed. Appx. at 516 (6th Cir. 2018) (bus driver's ongoing dangerous driving did not preclude plausible affirmative act by principal when he instructed children to board the bus). As *M.J.* and *M.S.* make clear, the presence of a

preexisting danger does not preclude an affirmative act as a matter of law. When some preexisting danger is at issue at the pleading stage, the correct question for the court is still whether defendants committed "an affirmative act" that "either created or increased the risk"—in other words, whether the court can "reasonably infer, as [it] must at this stage of litigation, that [the plaintiff] was safer before [the defendant's acts]". *M.J.* at 499. This is a context-specific question of fact. Here, where Defendants knew the danger, and the pre-existing danger was completely neutralized, it is plausible that Defendants' actions then created, re-created, or increased the risk of harm.

Second, as shown by Defendants' near-total reliance on summary judgment opinions, Defendants assume the Court will construe the facts in their favor. They effectively request dismissal of the pleadings because they could not have done anything to stop E.C.: "the shooting would have occurred even if Defendants had not acted." (First Brief, Doc: 42, Page 46). This is a classic question of fact. Defendants also assert that "this is not a case where 'the private actors had no desire to harm the plaintiffs before the state' acted, and thus the risk of harm did not exist before the state action." (First Brief, Doc: 42, Page 47). But that assertion, too, is merely Defendants' conclusion of fact; it is not Plaintiffs' allegation. It is wholly plausible that with a complete factual record, a jury could find that when E.C. met with Hopkins and Ejak, he was fantasizing about a school shooting but had not yet

formed the desire to carry it out. E.C. pleaded for someone at the school to help him stop the terrifying thoughts he was experiencing. *See St. Juliana* Complaint, R. 1., Page ID # 16, ¶55. ("the thoughts won't stop, help me"). A jury could find that E.C.'s intentions were neutralized when he was safe in the counseling office and separated from his backpack, but Hopkins and Ejak then made the situation dangerous— threatening E.C.'s parents in front of him, handing him the backpack with the weapon, and directing him to proceed to class. A jury could find that Oxford High School was safer before Hopkins and Ejak acted than after they acted. *See* Guidepost Report, R. 157-4, PageID # 2589, p. 472 (concluding, in the face of his abject denials, that Defendant Hopkins "contributed directly to the tragic shooting on the afternoon of November 30, 2021.").

Here, the district court correctly recognized causation as a critical issue of fact that could not be resolved at the pleading stage: "As a matter of pleading, it is plausible that a state official's statements can increase the risk of harm by prompting a private actor to commit violence." (*Franz*, R. 142, Opinion & Order, Page ID # 2231 (citing *Lipman*, 974 F.3d at 730-731, 746-747)). "Taking all of Plaintiffs' allegations as true, as it must at this stage, the Court finds that Plaintiffs' pleadings on this claim withstand Defendants' motion for judgment on the pleadings" because "Plaintiffs allege that Hopkins and Ejak pushed E.C. closer to violent action by threatening to report his parents to CPS in the immediate future in E.C.'s presence."

(R. 142, Page ID # 2232). The district court rejected Defendants' attempt to dispute Plaintiffs' position that E.C. may not have proceeded with the shooting if Hopkins and Ejak had not made the threat: "the Court looks to Plaintiffs' pleadings to assess the plausibility of their allegations, and Plaintiffs have sufficiently alleged that Hopkins and Ejak's act of 'interviewing E.C.'s [sic] in front of his parents . . . accelerated the violence planned." (R. 142, Page ID # 2233 n.11 (quoting from several of Plaintiffs' complaints, including the *St. Juliana* Complaint, R. 1, ¶¶89, 140).

In all of Defendants' briefing on affirmative acts, they cite just two opinions decided at the pleading stage. (First Brief, Doc: 42, Page 33-49). One is *Brooks*, which is the only case Defendants offer in support of their position that was not decided as summary judgment. *See id.* (citing 221 F. App'x 402, 407 (6th Cir. 2007) (affirming judgment on the pleadings for defendants where plaintiffs solely alleged the absence of action by defendants, such as "failure to arrest")). The affirmative acts alleged here distinguish this case from the pure "failure to act" allegations in *Brooks*. Defendants cite just one other case from the pleadings stage—*M.J.*—but only in passing for a rule statement. (First Brief, Doc: 42, Page: 34). Defendants do not acknowledge the facts or the ruling because *M.J.* controls here and defeats their attempt to seek dismissal on the pleadings.

2. <u>Plaintiffs plausibly allege Hopkins and Ejak created</u>
<u>or increased the risk of harm to Plaintiffs.</u>

Defendants selectively pull from over 20 cases to argue for dismissal as a matter of law because there is no single case on point to support their position. All but one of those cases had the benefit of discovery. Defendants' fact-intensive authorities were decided at summary judgment, primarily involving police conduct, and do not change the plausibility of Plaintiffs' allegations, as recognized by the district court.

Defendants also argue that Hopkins and Ejak did not "*greatly* increase the risk of harm." (First Brief, Doc: 42 Page: 33). This argument implicitly concedes that Hopkins and Ejak increased the risk, confirming Plaintiff's allegations as plausible. It also raises another purely factual question: how much of an increase is enough? Must defendants "greatly" increase the risk? "Substantially?" Must they create a risk that never would have existed, but for their actions? Is it sufficient that they re-create a risk that had been neutralized in their own presence, with their knowledge of danger? Defendants' cases do not answer these questions as a matter of law, precisely because they are inherently factual.

It is reasonable to infer from the pleadings that when E.C. was seated in the counseling office, separated from his backpack, supervised by school staff, he was less likely to commit the shooting. It is reasonable to infer that when Defendants Hopkins and Ejak then threatened, in E.C.'s presence, to report E.C.'s parents to

CPS, they increased the risk that E.C. would act on his violent ideas. This Court should affirm the district court's conclusion: "Plaintiffs have plausibly alleged that Hopkins and Ejak increased the risk that a mentally unstable teenager—suspected of harboring violent thoughts—would harm others when they threatened his parents with this imminent ultimatum in that teenager's presence." *See Franz*, R. 142, Page ID # 2232. The precise forces of causation on November 30, 2021 are questions of fact. As this Court explained in 2021, if the existence of an affirmative act is a "close call" at the pleading stage, a court construes the facts in favor of the plaintiff "as [courts] must at this stage of the litigation." *M.J.*, 1 F.4th at 449 (finding multiple plausible affirmative acts by school officials). Here we "can reasonably infer, as we must at this stage of the litigation," that Plaintiffs were safer before the threat by Hopkins and Ejak because it may have convinced E.C. to shoot. *See id.*

3. Defendants' policy argument for dismissal again asks the Court to draw factual conclusions in their favor.

Third, Defendants argue that finding a plausible affirmative act on these pleadings would discourage public officials from "attempting to help" by recommending mental health resources. (First Brief, Doc: 42 Page: 49). This mischaracterizes the facts alleged. Plaintiffs do not allege that Defendants merely tried to provide mental health resources. Plaintiffs allege that Defendants recognized the warning signs that E.C. was actively suicidal and that he posed a threat to himself

and others. Discovery is necessary to determine whether Hopkins and Ejak followed existing laws and school policies to properly assist a student in a mental health crisis. *See* Guidepost Report, R. 157-4, Page ID # 2588, p. 464 (Finding that Defendants "never should have allowed the Shooter to return to the classroom after they reviewed the concerning drawings and troubling statements on the math assignment. This conclusion is not based on hindsight but instead on application of OHS's suicide prevention protocol.").

Further, Plaintiffs allege that Hopkins and Ejak knew E.C. was fantasizing about gun violence, had access to firearms, pleaded for help and expressed awareness of his uncontrollable thoughts, and posed a threat to himself and others, yet still threatened to report E.C.'s parents to CPS in front of him. Threatening a CPS report in front of a highly distressed child is not the same as offering resources or providing basic counseling in good faith in the moment. As alleged, Defendants' conduct in this case is a lesson in what not to do. But at the pleading stage, there is no record from which to conclude what Defendants actually did or did not do.[13]

Defendants' argument invites the Court to trap itself in an impossible paradox. State actor defendants must have knowledge of danger in order to create or increase

---

[13] More facts continue to emerge. *See* Plaintiffs' Joint Motion for Relief, Franz R. 157, Page ID ## 2432-2455; *see also* DETROIT FREE PRESS, "Oxford High officials were assured they wouldn't be prosecuted in mass shooting" (Mar. 17, 2024), https://www.freep.com/story/news/local/michigan/oakland/2024/03/17/oxford-high-shooting-school-officals-not-prosecuted/72996052007/.

the risk of the danger to plaintiffs. But under Defendants' standard, if the defendants have knowledge, then by definition, the knowledge itself establishes that the danger was "preexisting," thus extinguishing liability regardless of defendant conduct. Proof of one element cannot completely negate proof of another element. On Defendants' reasoning, the more one knows, the less one's constitutional duty. That cannot be true. The better analysis is the one adopted by the Sixth Circuit in *M.J.* and *M.S.*, which recognizes that a defendant's knowledge of danger, combined with some action that increases the risk of harm, is sufficient to state a claim.

The district court correctly concluded this case requires a factual record: "Plaintiffs have made sufficiently plausible allegations to get the same opportunity" for discovery as parties had in Defendants' cited cases. (Opinion, R. 142, Page ID # 2233 n.11 (referring to the opportunity for discovery in *Mays,* 437 F.3d at 586). At this stage, the details of Defendants' knowledge, their actions, and their impact on E.C. are mere allegations. A preexisting danger does not foreclose an affirmative act as a matter of law. Discovery is necessary to determine precisely what Hopkins and Ejak knew, what they did, and what impact this had on E.C.

**B. With Knowledge that E.C. Was Fantasizing About Shooting People, That He Had Access to Firearms and Knew How to Use Them, That He Was Aware of His Own Uncontrollable Thoughts and Was Pleading for Help, and That He Was In An Acute Mental Health Crisis, Defendants Knew Their Actions Specifically Risked the Possibility of a Shooting at Oxford High School.**

Defendants dispute the third element of Plaintiffs' state-created danger claim. For state culpability, Plaintiffs must allege that the state official was "aware of facts from which the inference could be drawn that a substantial risk of serious harm exist[ed], and he [or she] must also draw the inference." *Doe v. Jackson Loc. Sch. Dist. Bd. Of Ed.*, 954 F3d. 925, 933 (6th Cir. 2020) (punctuation modified). "This knowledge prong is synonymous with the requirement that the state official's conduct must fairly be said to shock the contemporary conscience." *Lipman*, 974 F.3d at 744 n.7. "[C]onduct typically meets this conscience-shocking standard when the executive actor is deliberately indifferent to the risk of a private party's harm." *Id.* Here again, a court "must draw all reasonable inferences in favor of Plaintiffs when assessing whether the facts in their complaint demonstrate a state-created danger." *Id.* at 746. "Deliberate indifference that shocks in one environment may not be so patently egregious in another, and our concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *Guertin v. State*, 912 F.3d 907, 923 (6th Cir. 2019) (quoting *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)).

A court must have a full factual record to assess requisite culpability, and any issue of fact, such as a defendant's subjective knowledge or belief, must be "fleshed out during discovery and are not appropriate to resolve at the motion-to-dismiss

posture." *Guertin*, 912 F.3d at 927; *see also Bartynski v. City of Highland Park, Michigan*, No. 21-10049, 2022 WL 390892, at *4 (E.D. Mich. Feb. 8, 2022) ("The question of whether conduct is conscience-shocking is fact specific" and "depends on the facts and circumstances of the individual case.").

The district court correctly applied this standard: "The Court is satisfied that Plaintiffs have sufficiently alleged facts supporting an inference that Hopkins and Ejak were aware that E.C. 'presented a substantial risk of deadly harm to others.'" R. 142, Page ID # 2234 (quoting *St. Juliana* Compl., R. 1, ¶ 92). The district court also relied on Defendants' admitted doubts about whether E.C. was referring to a video game, their recognition that E.C. was suicidal, and the multiple reports Defendants had received about E.C. leading up to the shooting. *Id.* Page ID ## 2234-2235. The district court also noted that Defendants relied "almost entirely" on case law decided at summary judgment. R. 142, Page ID # 2235. But here, "the full circumstances of the encounter in the counselor's office, including the details of the alleged threats, are not of record." *Id.*, Page ID # 2236. The district court properly found Plaintiffs have adequately alleged requisite culpability to proceed to discovery.

Defendants repeatedly mischaracterize the pleadings to argue that Plaintiffs have not alleged the requisite knowledge. They claim Plaintiffs do not allege that Defendants were aware of facts from which the inference could be drawn that a

substantial risk of harm exists, or that Defendants knew of the specific risk that later developed. (First Brief, Doc: 42, Page 50-61). A review of the complaint, however, shows that Ejak and Hopkins saw all the classic signs of a school shooting, and from those signs, they knew their actions specifically risked the possibility of a shooting at Oxford High School.

Taking Defendants' mischaracterizations in order, they say, first: "Nothing about what Defendants knew could have put them on notice that E.C. posted the *specific* risk of shooting multiple students." (First Brief, Doc: 42, Page 53). Plaintiffs' complaints allege Hopkins and Ejak started receiving warning signs that E.C. was considering gun violence at school the day before the shooting, at the latest. The day before the shooting, Ejak and Hopkins received emails notifying them that E.C. he was looking up bullets on his phone. *St. Juliana*, R. 1, Page ID # 15, ¶¶43-44. When Hopkins met with E.C. in the counseling office that day, E.C. told Hopkins and another counselor that he went to a gun range the previous weekend and that firearms were a family hobby. *Id.* ¶48. The morning of the shooting, Hopkins received another email reporting that E.C. was watching a shooting video on his phone. *Id.* ¶54. Thirty minutes later, Hopkins and Ejak received a warning email from a second teacher with the photo of E.C.'s math worksheet. *Id.*, Page ID # 16, ¶55.

On this point, Defendants say: "E.C. one time drew odd depictions and wrote statements of depression on one assignment." (First Brief, Doc: 42, Page 53). Defendants' deliberate choice of the phrase "odd depictions" is a sickening understatement. The worksheet included E.C.'s drawing of his Sig Sauer 9mm handgun, a person with two gunshot wounds with blood dripping from the mouth, a drawing of a shell casing or bullet, and the words, "The thoughts won't stop. Help me . . . blood everywhere . . . My life is useless . . . The world is dead." *St.* Juliana, R. 1, Page ID # 16, ¶55. This drawing alone is enough for a jury to find that Hopkins and Ejak knew or should have known their actions created a specific risk to the Oxford High School Community.



*Beausoleil*, R. 1, Page ID # 8 ¶35.

Third, Defendants claim: "There is also no allegation that any Defendants knew E.C. had a weapon in his possession that day or that he planned to commit an act of gun violence." First Brief, Doc: 42, Page 53. This is another distortion of the

pleadings. Plaintiffs allege that Hopkins and Ejak knew E.C. had access to guns, knew how to use them, and that he was fantasizing about shooting people and "blood everywhere" as depicted on his math worksheet. *St. Juliana*, R. 1, Page ID # 15, ¶48;, Page ID # 16, ¶55; Page ID # 22, ¶97. "Hopkins and Ejak also knew, or should have known, that [E.C.] had expressed homicidal ideation and that he presented a substantial risk of deadly harm to others." Page ID # 21, ¶92.

Specific conduct by Defendants further shows that they actually inferred the risk of serious harm in the form of a shooting. Hopkins testified at the preliminary examination for E.C.'s criminal proceedings that he knew E.C. was lying when he claimed the drawings were for a video game. Hopkins told E.C.: "This does not sound like a video game." R. 1, Page ID # 18-19, ¶66-68. Hopkins determined E.C. was suicidal. *Id.* Page ID # 19, ¶ 70. "It is well established that many shooters in mass shooting events were suicidal before the attack commenced." *Id.*, Page ID # 10, ¶ 17. Hopkins recognized the risk of danger to the Oxford High School community enough to ask E.C. if he was a threat to himself or others. *Id.*, Page ID # 19, ¶ 71. Hopkins and Ejak knew E.C. presented a specific threat, as demonstrated by their conclusion that he was suicidal, that he was lying about whether he was a threat to himself and others, and by their decision to call EC's parents to the school for an intervention. *Id.*, Page ID # 19-20, ¶¶74-82. Hopkins was so concerned that

he used the school's attendance reporting system to remotely track E.C. for the rest of the day. *Id.*, Page ID # 23, ¶103.

With all of these facts, a reasonable jury could find it shocking to the conscience that Hopkins and Ejak threatened to report E.C.'s parents to CPS in front of him, handed him the bag with the gun, and directed him to class, because they specifically knew that E.C. was suicidal, that E.C. had an obsession with guns and gun violence, that E.C. had been researching bullets in school and had told Hopkins that he enjoyed shooting guns, that E.C. had been watching a video of a shooting during his first hour class, that in his second hour class E.C. had drawn disturbing and violent words and images onto a paper assignment, including: "The thoughts won't stop. Help me…blood everywhere…My life is useless…the world is dead"; that E.C.'s parents were informed of his suicidal ideation and abandoned him at school, that E.C. was a threat to himself and others, and lied about it. Under these circumstances, Defendants had a constitutional obligation to keep E.C. away from the classroom environment given their specific knowledge. Their deliberate actions to threaten EC, give him the bag containing his weapon, and direct him to class are shocking to the conscience. *See* R. 1, Page ID # 26, ¶118; Page ID # 36, ¶151.

With this accurate view of the pleadings, Defendants' cited authorities are clearly distinguishable. In *McQueen*, the teacher had no warning whatsoever that the student might have a firearm. *Id.* at 462–63. The teacher only knew the student's

history of "disruptive and sometimes violent behavior," and the plaintiff presented no evidence at summary judgment that the teacher "knew or even suspected that Smith had a gun, knife, or other similarly dangerous weapon . . . nor did Smith's history of behavioral problems suggest that he would escalate from hitting with fists, feet, and pencils to such weapons." *Id.* at 470. Here, Defendants had repeated warnings that E.C. had access to guns, knew how to use them, and that he was actively fantasizing about shooting people. Likewise, in *Doe v. Jackson*, 954 F.3d at 935, the student's extensive history of bullying and physical assault did not establish knowledge of the "kind and degree of risk" that the student would commit sexual assault. *Id*. Here, E.C. was drawing pictures of shooting people and writing "blood everywhere . . . the thoughts won't stop, help me." *St. Juliana*, R. 1, Page ID # 16, ¶55. Ejak and Hopkins had notice of precisely the "kind and degree" of risk that ultimately occurred. *See Doe*, 954 F.3d at 935.

Ejak and Hopkins acted with callous indifference to this risk when they threatened E.C.'s parents in front of him, and then gave him the backpack with the gun and sent him to class. Plaintiffs have adequately pled state culpability because it is conceivable from these allegations that Defendants' conduct shocks the conscience. *See M.S.*, 756 Fed. Appx. at 517 ("Because it is conceivable that the principal received complaints [about the bus driver] such that it would be conscience-shocking for her to have instructed the schoolchildren to board [the] bus

after their receipt, it would be inappropriate to grant a motion to dismiss on this ground."). Ejak and Hopkins faced all the classic signs of a school shooting, and from those signs, they knew or should have known that their actions specifically endangered Plaintiffs.[14]

## C. Plaintiffs' Right to Be Free From Affirmative Acts by School Officials That Rendered Them More Vulnerable to a School Shooting Was Clearly Established at The Time of the Shooting.

Plaintiffs' right to be free from affirmative acts by school officials that rendered them more vulnerable to a shooting was clearly established at the time of the shooting. Defendants' affirmative acts occurred November 30, 2021, the day of the shooting. The right to be free from state-created danger was clearly established in 2017 at the latest. *Lipman*, 974 F.3d at 749. No later than 1998, "the Sixth Circuit recognized a right against government acts that threaten an individual's 'security and bodily integrity,'" and held that state actors can be held liable under § 1983 for a state-created danger on that basis." *Lipman*, 974 F.3d at 749–50 (citing *Kallstrom v. City of Columbus*, 136 F.3d 1055 (6th Cir. 1998)). "Numerous other cases have reiterated this doctrine." *Id*. "And in *Nelson* [*v. City of Madison Heights*], this Court directly addressed qualified immunity with respect to state-created danger, rejecting

---

[14] According to the independent investigation, Defendants and their counsel may have acted to conceal the extent of their culpable knowledge. (*See Franz*, Motion for Relief from Judgment and For Leave to File Amended Complaints, R. 157, Page ID # 2432-2455).

the officer's claim to qualified immunity because *Kallstrom* clearly established [in 1998] that the state may not affirmatively act in a way that creates or increases a risk of private violence, provided that the state actor had the requisite mental culpability." *Id*. (citing *Nelson*, 845 F.3d 695, 700–03 (6th Cir. 2017)).

Defendants argue that they were not on notice that it would be a due process violation to take the actions they took under the "particular circumstances" of this case. (First Brief, Doc: 42, Page: 62). They claim there was no way for them to know that it might be unconstitutional to threaten a suicidal student with involuntary mental health treatment and family separation, and then send that suicidal and likely homicidal student to class, even after learning that he had just been watching shooting videos in school and was actively fantasizing about shooting people, as shown on his math worksheet containing a picture of a gun, a bloody shooting victim, and words including: "The thoughts won't stop. Help me."

In the face of the facts presented, Defendants' arguments are absurd. The Supreme Court and this Court have rejected such a narrow reading of the doctrine. Even if there are no cases with the exact same particular facts as this case, this "does not grant defendants a qualified immunity shield." *Guertin*, 912 F.3d at 933. "Rather, it showcases the grievousness of their alleged conduct: 'The easiest cases don't even arise[.]'" *Id*. (quoting *United States v. Lanier*, 520 U.S. 259, 271 (1997)).

**D. Dismissal Based on Qualified Immunity Is Inappropriate At The Pleadings Stage.**

This Court has "cautioned that 'it is generally inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity.'" *Buddenberg v. Weisdack*, 939 F.3d 732, 738–39 (6th Cir. 2019) (quoting *Wesley v. Campbell*, 779 F.3d 421, 433 (6th Cir. 2015)). Defendants argue that based on *Jones*, *Koulta, McQueen,* and *Walker*, and "the police cases," it is not clearly established that Defendants violated Plaintiffs' substantive due process rights. (First Brief. Doc: 42, Page: 63). As detailed above, those cases are not only factually different from this case; all were decided at summary judgment.

An assertion of qualified immunity does not alter the standard of review at the pleadings stage. Analyzing whether an alleged constitutional violation is clearly established "is sometimes difficult on the pleadings, since that inquiry may turn on case-specific details that must be fleshed out in discovery." *Myers v. City of Centerville*, Ohio, 41 F.4th 746, 758 (6th Cir. 2022) (affirming denial of qualified immunity at pleadings stage) (punctuation modified). "Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is obvious or squarely governed by precedent[.]" *Moderwell v. Cuyahoga Cnty., Ohio*, No. 20-3879, 2021 WL 1897949 (6th Cir. May 12, 2021) (punctuation modified).

**E. The District Court Correctly Held That Dismissal Based on Qualified Immunity Is Inappropriate At The Pleadings Stage Given Plaintiffs' Plausible State-Created Danger Claims.**

The district court correctly held "Plaintiffs' allegations—asserting that Defendants took actions that endangered Plaintiffs' bodily security—suffice to survive a qualified immunity defense at the pleadings stage," because "[w]hether the rights at issue are clearly established is ultimately a question that requires factual development." (Franz, R. 142, Page ID # 2241 (citing *Wesley*, 779 F.3d at 433). The district court therefore properly denied Defendants' qualified immunity defense based on the pleadings as to Plaintiffs' state-created danger claims against Hopkins, Ejak, and Oxford Community Schools. *Franz*, R. 142, Page ID # 2241.

Here, qualified immunity is entirely fact-bound. Without discovery, the details of Defendants' knowledge, Defendants' actions, and their impact on the shooter are incomplete. Because "the legal question of qualified immunity turns upon which version of the facts one accepts, the jury, not the judge, must determine liability." *See Pouillon*, 206 F.3d at 715. This Court therefore should affirm the district court's denial of qualified immunity as to Plaintiffs' state-created danger claims against Hopkins and Ejak.

II. **THE DISTRICT COURT ERRED WHEN IT DISMISSED STATE-CREATED DANGER CLAIMS WHERE DEFENDANTS CONCEALED THE CREDIBLE THREAT OF A SCHOOL SHOOTING AND INSTEAD RETURNED E.C.'S BACKPACK CONTAINING THE GUN AND DIRECTED E.C. TO ATTEND CLASS.**

The district court erred in two ways when it held that returning E.C. to class with his backpack did not plausibly increase the risk that E.C. would harm other people. *Franz*, R. 142, Page ID # 2228-2230. First, the court improperly made determinations of fact and construed the facts in a light most favorable to Defendants at the pleading stage. Second, the district court incorrectly disregarded Sixth Circuit authority on state-created danger in schools.

## A. The District Court Erred By Drawing Conclusions Of Fact And Construing The Facts Against Plaintiffs At The Pleadings Stage.

At the pleading stage, a court "must draw all reasonable inferences in favor of Plaintiffs when assessing whether the facts in their complaint demonstrate a state-created danger." *Lipman*, 974 F.3d at 746. The district court followed the correct standard of review in its analysis of Defendants' threat to report E.C.'s parents to CPS in his presence, *see* R. 142, Page ID # 2230-2232, but failed to do so in its analysis of Defendants' decision to hand E.C. his backpack with the gun and send him to class, *see id.*, Page ID # 2228-2230. Regarding the acts of returning the backpack and directing the shooter to return to class, the district court changed course and treated the shooting as a fixed preexisting danger that Defendants could not have altered through their conduct—despite having rejected that reasoning in its analysis of their threat to the parents. The district court stated: "All facts indicate that E.C. came to school on November 30, 2021 prepared to commit a shooting. The risk that E.C. would do so was a preexisting danger . . . Hopkins and Ejak did no

more than return the student body to already-extant state of danger." R. 142, Page ID # 2228 (cleaned up).

This was an error. At the pleading stage, a court cannot draw such firm conclusions as to the creation or exacerbation of danger without resolving material issues of fact. It is a reversible error to dismiss such cases at the pleadings stage, as this Court recently reiterated in *M.J.* and *M.S.*

**B. The District Court Incorrectly Disregarded Sixth Circuit Case Law On State-Created Danger In Schools At The Pleading Stage.**

As Plaintiffs/Cross-Appellants detailed above, and central to these cross-appeals, some preexisting or premediated danger does not preclude an affirmative act as a matter of law. *See* Section I(A), *supra*. The proper question at the pleadings stage is whether the court can reasonably infer from the allegations that plaintiffs were safer before the defendants' affirmative actions. In *M.S.*, this Court reversed the dismissal of a state-created danger claim against a school principal and school district where the principal—aware that the driver of a school bus engaged in dangerous driving—allegedly "instruct[ed]" students to board the bus and "assist[ed] students onto [the] bus," and a subsequent bus crash injured and killed multiple students. This Court considered and rejected the school district's argument that the principal "merely returned the students to a risky status quo" and distinguished the allegations from cases where it was undisputed that defendants "played *no* part in creating the danger." *Id.* at 516-517 (emphasis added). Because

M.S. alleged facts indicating that the principal potentially played some part in creating the danger, this Court recognized the affirmative act was adequately pled and causation was a fact question for later proceedings: "whether the principal's act increased the danger to the students is precisely what is at issue." *Id.* at 517. Precisely the same is true here.

Likewise in *M.J.*, where plaintiffs alleged that a teacher handed a telephone to a man posing as a police officer and thereby granted him the ability to deceive a student's mother into believing he was legally entitled to discipline her son, this Court confirmed that was a plausible affirmative act: "We can reasonably infer, as we must at this stage of the litigation, that W.H. was safer before [the teacher] handed [the fake officer] the phone because [he] may have used the opportunity to convince [the mother] that he was a police officer with authority to handcuff her son." *M.J.*, 1 F. 4th at 449. The fake officer's premeditated plan to assault the children did not alter the plausibility that the teacher's actions made the situation more dangerous. Here too, we "can reasonably infer, as we must at this stage of the litigation," that Plaintiffs were safer before Defendants met with E.C. and his parents, handed E.C. his backpack, and directed him to class because their actions may have convinced E.C. to carry out his plan and granted him the ability to do so. *See id.*

The district court erred by relying primarily on cases involving police encounters decided at summary judgment. *See* R. 142, Page ID #2228-2230

(discussing *Walker*, *Ryan*, *Bukowski*, and *Cartwright*).[15] These cases are factually distinguishable and procedurally different, as Plaintiffs-Appellees discuss in detail above. *See supra*, Section I(A)(1). While the district court did cite *M.S.*, the court reasoned incorrectly that defendants here are "less like the *M.S.* principal and more like state officials who were found *not* to have committed actionable affirmative acts by temporarily isolating private actors and then releasing them, thus restoring the preexisting state of risk without increasing it." R. 142, Page ID.2229. But those authorities were either decided at summary judgment or involved pure allegations of failure to act. At the pleadings stage, where plaintiffs identify plausible affirmative acts, a court cannot make a factual determination whether defendants "restor[ed] the preexisting state of risk without increasing it." *Id*. Unlike cases like *Brooks* where defendants "played no part in creating the danger," if plaintiffs describe affirmative acts in their pleadings, "whether the [state officials'] act[s] increased the danger to the [plaintiffs] is precisely what is at issue." *M.S.*, 756 Fed. Appx. at 517.

Here, just as the district court recognized it is plausible that threatening to report his parents to CPS could have caused E.C.'s shooting fantasy to become a reality, it is equally if not more plausible that when Ejak and Hopkins handed E.C. his backpack and directed him to class, such action caused or increased the danger

---

[15] The district court also cited *Brooks*, 221 F. App'x at 407, but that case involved allegations of pure failure to act, such as failure to arrest. The affirmative acts alleged here by Plaintiffs distinguish this case.

to Plaintiffs. With the benefit of a factual record, a jury could draw that inference for or against Defendants, but without such a record, a court may not.

Indeed, a jury could assess causation to find that Defendants created or increased the danger to Plaintiffs in several different ways. A jury could find that when E.C. was seated in the counseling office, separated from his backpack, and under supervision, the danger was neutralized, no longer inevitable, and had completely ceased, but Defendants then "recreated" the danger. *See Est. of Sanchez*, 2023 WL 4092468, at *9-10 (finding it plausible, despite prior intoxicated driving, that "Plaintiffs were safer sitting in the deactivated, driverless, parked car than they were after Defendants ordered them to go home in the car with a drunk driver," and officers "recreated" the danger by ordering him to drive plaintiffs home). Alternatively, a jury could find that E.C. was fantasizing about a school shooting and pleading for help, and that Defendants pushed E.C. closer to that plan, thereby "increasing the likelihood" that E.C. would harm Plaintiffs. *See Lipman*, 974 F.3d at 749–50; Opinion & Order, R. 142, Page ID #2232 ("the dean and the counselor 'added fuel to the fire'"). Or a jury could find that E.C. was not going to commit the school shooting until he met with Defendants; the attack was still a fantasy while the shooter openly expressed warning signs and pleaded for help, and that Defendants pushed him over the tipping point to make it a reality.

A jury could find causation on any of those three theories by relying on the fact that E.C. did not immediately start shooting when he first arrived at school, the fact that he was asking for help to stop the thoughts, and the fact that the shooting took place after the encounter with Defendants. *See St. Juliana* Compl., R. 1, Page ID # 16, ¶55 ("The thoughts won't stop. Help me."); Page ID # 24, ¶¶105-106 ("Less than two hours after Ejak and Hopkins released [E.C.] from the safety and security of the counseling office . . . [he] opened fire.").

The district court correctly recognized causation as an issue of fact with respect to Defendants' conversation with E.C.'s parents, but mistakenly drew conclusions of fact with respect to causation for Defendants' other affirmative acts, all of which took place at the same time with the same actors. The district court erred by substituting its own causation assessment at the pleading stage.

## C. Returning the Gun to E.C. and Directing Him To Class Was An Affirmative Act.

It is reasonable to infer that when E.C. was seated in the counseling office, separated from his backpack, supervised by school staff, he was less likely to commit the shooting than after Defendants threatened, in E.C.'s presence, to report E.C.'s parents to CPS, and then handed him his backpack containing the gun and directed him to attend class.

The acts of returning the backpack with the gun and ordering E.C. to go to class are analogous to the police officer in *Sanchez* returning an intoxicated man to

his car and ordering him to drive. There, although the intoxicated driver posed some pre-existing danger before a traffic stop, officers plausibly recreated the danger when they directed him to get back in his car and drive home. *Est. of Sanchez*, 2020 WL 7122085, at *5. There it was plausible that "Plaintiffs were safer sitting in the deactivated, driverless, parked car than they were after Defendants ordered them to go home in the car with a drunk driver." *Id.* at *9-10. Here too, it is plausible that Plaintiffs were safer when E.C. was sitting in the counseling office, separated from his backpack and his gun, completely secure, than when Defendants handed the backpack and gun to E.C. and ordered him to class. Contrasting this case with *Koulta* is instructive. In *Koulta*, this Court held police did not create or increase the woman's propensity to drink and drive where (unknown to police) she had already been driving drunk that night, and the police did not instruct or "require" her to drive; they only directed her to "go home" and she had various means to get home. *Id.* at 446. But here, like the officers in *Sanchez* and unlike the officers in *Koulta*, Hopkins and Ejak required E.C. to return to class. They instructed him to go to the place where he would be most dangerous: the halls and classrooms of Oxford High School. In further contrast with *Koulta*, there the court noted that police did not know the driver had consumed a second bottle of malt liquor as well as prescription medication. 7 F.3d at 446. Here, Defendants had extensive knowledge about the risk of a school shooting. Hopkins and Ejak knew E.C. had access to guns, knew how to use them,

and that he was fantasizing about shooting people and "blood everywhere" as depicted on his math worksheet. R. 1, Page ID # 15, ¶48; Page ID # 16, ¶55; Page ID # 22, ¶¶97-99. They knew E.C. was expressing homicidal ideation. Page ID # 21, ¶ 92. Hopkins told E.C., "this does not sound like a video game." Page ID # 19, ¶ 68. They suspected enough to ask him "if he was a threat to himself or others." *Id.* ¶ 71. Hopkins "used the school's attendance reporting system to remotely track [E.C.] through the day." Page ID # 22 ¶¶ 98-99. School officials had custody of the firearm and the danger was neutralized. Then, Defendants returned the backpack with the gun to a person in the midst of an acute mental health crisis.

The direction to E.C. to return to class is comparable to the instruction in *M.S.*, or the conversation in *M.J.,* because it is reasonable to infer Plaintiffs were safer before those statements. In *M.S.*, plaintiffs stated a claim where a school principal instructed her students to board a school bus despite knowing that the bus driver was a dangerous driver. *Id.* at 516. In the lower court proceedings here, the district court arbitrarily distinguished between "instructing eventual victims . . . to place themselves in danger" from "h[olding] a private actor . . . and then return[ing] him to his previous position." R. 142, Page ID.2229. But Defendants did more than detain and release E.C. *See supra* Section I(A) (distinguishing this case from police detention cases). Plaintiff is also unaware of any legal authority to support a distinction between instructing victims to enter a zone of danger from instructing an

assailant to enter and create a zone of danger (even more egregious since the act of driving a bus is not *inherently* dangerous, but the act of directing a suicidal student to the classroom *is* inherently dangerous to the point of being indefensible), making it particularly inappropriate for resolution on the pleadings. Moreover, in *M.S.*, on appeal this Court rejected the school district's argument that the principal "merely returned the students to a risky status quo." *Id.* at 516. This Court distinguished the principal's actions from cases like *DeShaney* where defendants "played *no* part in creating the danger" (emphasis added) and treated the affirmative act as a fact issue that was adequately pled because the plaintiffs had identified conduct by the principal that went beyond mere inaction: "whether the principal's act increased the danger to the students is precisely what is at issue." *Id.* at 516-517. The very same analysis applies here. As in *M.J.*, a conversation with a potentially dangerous third party, the shooter, is an affirmative act if it is reasonable to infer the plaintiff was safer before the conversation. *Id.* at 449. This Court confirmed the plaintiffs stated a claim where a teacher called a student's mother and then handed the phone to a man posing as a police officer, who spoke to the mother and then handcuffed her son. The Sixth Circuit considered it a "close question" whether this constituted an affirmative act and therefore construed the allegations in favor of the plaintiff. *M.J.*, 1 F.4th at 449. Likewise here, we can "reasonably infer, as we must at this stage of the litigation," that Plaintiffs were safer before Defendants handed E.C. his backpack

and directed him to class because they ordered E.C. to attend class rather than remain in a secure location, endangering Plaintiffs. *See id.*

A reasonable jury could also find that all of these affirmative acts had a cumulative effect on E.C. because the factfinder would be assessing the impact of Defendants' actions cumulatively for their impact on the status quo, just as E.C. did.

In sum, it is reasonable to infer that E.C. never would have carried out the shooting if Defendants had not seen his cries for help, made him safe, and then sent him back out into the school. Plaintiffs were safer before Hopkins and Ejak handed him his backpack containing the 9mm handgun and directed him to class. They did so with actual knowledge that sending E.C. to class rendered others in the school unsafe. They knew he had access to firearms, that he was in acute mental distress, and he had just covered his math worksheet with a plea for help and specific warnings that he was contemplating a school shooting, including drawings of shooting people and "The thoughts won't stop. Help me." On these facts, a jury could conclude that plaintiffs were safer when E.C. was seated in the counseling office, separated from his backpack, and under supervision than after Defendants handed him the backpack and directed him to class.

This is not a case where officials "played no part in creating the danger" and merely served as bystanders who failed to act. *See M.S.*, at 516-517. Hopkins and Ejak did not simply see the warning emails about E.C. and then proceed with their

day, taking no further action. They pulled him from class, secured his firearm, spoke with him at length, threatened his family with a CPS investigation, and sent him back to class with his gun. Just as in *M.S.*, "whether the[se] act[s] increased the danger to the students is precisely what is at issue." *Id.* at 517.

### D. Concealing Credible Plans To Commit A School Shooting From Law Enforcement And School Authorities Is An Affirmative Act.

"While the Sixth Circuit has not specifically ruled on whether affirmative misrepresentations and concealment are affirmative acts, other courts have found that they are affirmative acts in a state-created danger analysis." *Meyers v. Cincinnati Bd. of Educ.*, 343 F. Supp. 3d 714, 723 (S.D. Ohio 2018), *aff'd*, 983 F.3d 873 (6th Cir. 2020) (collecting cases). This case requires recognition that deliberate concealment of criminal activity, such as a threat to commit a school shooting, is a plausible affirmative act because the deliberate concealment may render a plaintiff less safe than they were before the state action.

Concealment is a step beyond mere failure to act. In *Meyers*, school officials did not simply fail to enforce disciplinary policies; they lied to a student's mother about the cause of his injuries and hid a severe bullying situation from parents. *Id.* at 723.[16] The court therefore denied the motion to dismiss because those acts

---

[16] On appeal, the *Meyers* court did not review the state-created danger claim because defendants only appealed their governmental immunity under Ohio law. *See Meyers*, 983 F.3d at 875.

plausibly "increased danger to [Plaintiff] because they prevented [his] parents from getting an accurate medical diagnosis as [he] was not checked for head trauma," and "caused [his] mother to send [Plaintiff] back to school . . . A reasonable juror could find that Defendants' acts placed [Plaintiff] in more danger." *Id.* at 724.

Courts in other circuits have adopted this standard. *See, e.g.*, *Baynard v. Malone*, 268 F.3d 228 (4th Cir. 2001) (where principal received repeated reports that teacher was sexually abusing students, "a factfinder could reasonably infer that [her] failure to respond to mounting evidence of potential misconduct by [the teacher] exhibited deliberate indifference"); *Lozano v. Baylor Univ.*, 408 F. Supp. 3d 861, 891 (W.D. Tex. 2019) (plaintiff stated plausible *Monell* claim where she alleged police concealed allegations of criminal conduct against student-athletes); *D.N. ex rel. Nelson v. Snyder*, 608 F.Supp.2d 615, 627 (M.D. Pa. 2009) (finding that concealment was an affirmative act in state-created danger); *Briscoe v. Potter*, 355 F. Supp. 2d 30, 44–45 (D.D.C. 2004) ("Defendants did not simply 'stand by and do nothing' once it became known that the Brentwood facility was contaminated with anthrax. Defendants are alleged to have engaged in a series of actions which intentionally misled Plaintiffs into believing the facility was safe and prevented them from acting to preserve their own safety.").

Here, Hopkins and Ejak held credible evidence that E.C. might attempt a school shooting. *See supra.* Having just sent E.C. out into the school, Defendants

concealed the credible threat of a school shooting from law enforcement, the school safety liaison officer, E.C.'s teachers, and other school officials, thus increasing the danger of a violent incident. R. 1, Page ID # 23, ¶104; Page ID # 26, ¶117; Page ID # 33, ¶140(c); Page ID # 37, ¶154. In doing so, they interfered with law enforcement's ability to act and functionally authorized E.C. to proceed.

The district court erred when it ruled as a matter of law that Defendants did not commit affirmative acts when they returned E.C.'s backpack containing the firearm, directed him to class, and then concealed the threat of a school shooting. This error requires reversal.

## CONCLUSION

For the foregoing reasons, the Court should affirm the district court on Defendants' appeal and reverse on Plaintiffs' cross-appeal.

Respectfully submitted,

PITT, McGEHEE, PALMER, BONANNI & RIVERS PC

/s/ Kevin M. Carlson
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Beth M. Rivers (P33614)
Kevin M. Carlson (P66704)
Danielle Y. Canepa (P82237)
*Counsel for St. Juliana Plaintiffs*
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800

FIEGER, FIEGER, KENNEY & HARRINGTON, P.C.

/s/ Robert G. Kamenec (w/p)
GEOFFREY N. FIEGER (P30441)
JAMES J. HARRINGTON (P65351)
ROBERT G. KAMENEC (P35283)
MILICA FILIPOVIC (P80189)
*Attorneys for Franz et al. Plaintiffs*
19390 West Ten Mile Road
Southfield, MI 48075
P: (248) 355-5555 / F: (248) 355-5148
r.kamenec@fiegerlaw.com

mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

DEBORAH GORDON LAW

/s/ Deborah L. Gordon  (w/p)
Deborah L. Gordon (P27058)
Elizabeth A. Marzotto Taylor (P82061)
Sarah Gordon Thomas (P83935)
*Attorneys for Ossege Plaintiff*
33 Bloomfield Hills Parkway, Suite 220
Bloomfield Hills, Michigan 48304
(248) 258-2500
dgordon@deborahgordonlaw.com
emarzottotaylor@deborahgordonlaw.com
sthomas@deborahgordonlaw.com

MUELLER LAW FIRM

/s/ Wolfgang Mueller (P43728) (w/p)
WOLFGANG MUELLER (P43728)
*Attorney for Beausoleil Plaintiff*
Attorney for Arthur Plaintiff
41850 W. 11 Mile Rd. #101
Novi, MI 48375
P: (248) 489-9653
wolf@wolfmuellerlaw.com

JOHNSON LAW, PLC

/s/ Ven Johnson (w/p)
Ven Johnson (P39219)
Kanwarpreet S. Khahra (P80253)

m.filipovic@fiegerlaw.com

GIROUX PAPPAS TRIAL
ATTORNEYS, P.C.

/s/ Andrew J. Laurila  (w/p)
Robert M. Giroux (P47966)
Andrew J. Laurila (P78880)
Matthew Klakulak (P60220)
*Attorneys for Asciutto & Vackaro Plaintiffs*
28588 Northwestern Hwy., Suite 100
Southfield, MI 48034
(248) 531-8665
alaurila@greatMIattorneys.com
mklakulak@greatMIattorneys.com

SOMMERS SCHWARTZ, P.C.

/s/ Matthew L. Turner (w/p)
Matthew L. Turner (P48706)
Lisa M. Esser (P70628)
John M. Malone (P81838)
Counsel for Mueller Plaintiffs
One Towne Square, Suite 1700
Southfield, MI 48076
T: (248) 355-0300
F: (248) 936-2158
lesser@sommerspc.com
mturner@sommerspc.com
jmalone@sommerspc.com

FLOOD LAW PLLC

/s/ Todd Flood (w/p)
Todd. F. Flood (P58555)

Christopher Desmond (P71493)
*Counsel for Myre Plaintiffs*
535 Griswold St., Suite 2632
Detroit, MI 48226
(313) 324-8300
vjohnson@johnsonlaw.com
kkhahra@venjohnsonlaw.com
cdesmond@venjohnsonlaw.com

*Counsel for Watson Plaintiffs*
155 W Congress St Ste 603
Detroit, MI 48226-3267
P: 248-547-1032
tflood@floodlaw.com

Date: March 18, 2024

## CERTIFICATE OF COMPLIANCE

I certify that this brief conforms to the requirements of Rules 341(a) and (b). The length of this brief, excluding the pages or words contained in the Rule 341(d) cover, the Rule 341(h)(1) table of contents and statement of points and authorities, the Rule 341(c) certificate of compliance, the certificate of service, and those matters to be appended to the brief under Rule 342(a), is 15,297 words.

PITT, McGEHEE, PALMER, BONANNI & RIVERS PC

*/s/ Kevin M. Carlson*
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Beth M. Rivers (P33614)
Kevin M. Carlson (P66704)
Danielle Y. Canepa (P82237)
*Counsel for St. Juliana Plaintiffs*
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system on March 18, 2024, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

PITT, McGEHEE, PALMER, BONANNI & RIVERS PC

*/s/ Kevin M. Carlson*
Michael L. Pitt (P24429)
Megan A. Bonanni (P52079)
Beth M. Rivers (P33614)
Kevin M. Carlson (P66704)
Danielle Y. Canepa (P82237)
*Counsel for St. Juliana Plaintiffs*
117 West Fourth Street, Suite 200
Royal Oak, MI 48067
(248) 398-9800
mpitt@pittlawpc.com
brivers@pittlawpc.com
mbonanni@pittlawpc.com
kcarlson@pittlawpc.com
dcanepa@pittlawpc.com

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

In accordance with Sixth Circuit Rule 28, Plaintiffs-Appellees/Cross-Appellants designate the following relevant district court documents from the respective proceedings in the United States District Court for the Eastern District of Michigan.

| Description | Docket Entry Number | Page ID # |
|---|---|---|
| **Franz et al v. Oxford Community School District, et al.** **Case No. 2:21-cv-12871** | | |
| First Amended Complaint | R. 29 | Page ID # 408-514 |
| Order Consolidating Cases | R. 30 | Page ID # 515 |
| Motion for Judgment On The Pleadings | R. 107 | Page ID # 1758-1841 |
| Plaintiffs' Response to the Motion for Judgment on the Pleadings | R. 119 | Page ID # 1915-1988 |
| Defendants' Reply to the Motion for Judgment On the Pleadings | R. 123 | Page ID # 2014-2043 |
| Opinion & Order Granting in Part and Denying in Part Defendants' Motion for Judgment on the Pleadings | R. 142 | Page ID # 2225-2233 |
| Defendants' Notice of Appeal | R. 148 | Page ID # 2268-2378 |
| Franz Plaintiffs' Notice of Cross-Appeal | R.152 | Page ID # 2379-2384 |

| | | |
|---|---|---|
| Plaintiffs' Joint Motion for Relief from Opinion & Order and For Leave to File Amended Complaints | R. 157 | Page ID # 2432-2455 |
| Index of Exhibits to Plaintiffs' Joint Motion for Relief from Opinion & Order and For Leave to File Amended Complaint | R. 157-1 | Page ID #2456 |
| Exhibit 1 to Plaintiffs' Joint Motion for Relief from Opinion & Order and For Leave to File Amended Complaint (Proposed Order) | R. 157-2 | Page ID #2457-2512 |
| Exhibit 2 to Plaintiffs' Joint Motion for Relief from Opinion & Order and For Leave to File Amended Complaint (Proposed First Amended Complaint) | R. 157-3 | Page ID # 2513-2568 |
| Exhibit 3 to Plaintiffs' Joint Motion for Relief from Opinion & Order and For Leave to File Amended Complaint (Guidepost Report Excerpts) | R. 157-4 | Page ID # 2569-2589 |
| Exhibit 4 to Plaintiffs' Joint Motion for Relief from Opinion & Order and For Leave to File Amended Complaint (Complaint for Declaratory Relief in Insurance Action) | R. 157-5 | Page ID # 2590-2644 |
| Defendants' Response to Plaintiffs' Joint Motion for Relief from Opinion & Order and For Leave to File Amended Complaints | R. 158 | Page ID # 2604-2649 |
| **Cunningham et al. v. Oxford Community School District et al.** | | |

| Case No. 2:22-cv-11398 | | |
|---|---|---|
| Complaint | R. 1 | Page ID ## 1-19 |
| Order Regarding Dismissal of Plaintiffs' Claims | R. 31 | Page ID # 115 |
| **Asciutto et al v. Oxford Community School District et al.** **Case No. 2:22-cv-10407** | | |
| Complaint | R. 1 | Page ID #1-38 |
| Order Regarding Dismissal of Plaintiffs' Claims | R. 61 | Page ID # 327 |
| **Beausoleil v. Oxford Community School District et al.** **Case No. 2:22-cv-11250** | | |
| Complaint | R. 1 | Page ID # 1-19 |
| Order Regarding Dismissal of Plaintiffs' Claims | R. 43 | Page ID # 135 |
| **Mueller, et al v. Oxford Community School District, et al.** **Case No. 2:22-cv-11448** | | |
| Complaint | R. 1 | Page ID # 1-67 |
| Order Regarding Dismissal of Plaintiffs' Claims | R. 72 | Page ID # 1331 |
| Notice of Cross-Appeal | R. 76 | Page ID # 1367-1372 |
| **Myre et al v. Oxford Community School District et al.** **Case No. 2:22-cv-11113** | | |
| Complaint | R. 6 | Page ID # 70-116 |

| Order Regarding Dismissal of Plaintiffs' Claims | R. 45 | Page ID # 237 |
| --- | --- | --- |
| Notice of Cross-Appeal | R. 52 | Page ID # 1296-1301 |

| **Ossege v. Oxford Community School District et al.** <br> **Case No. 2:22-cv-11251** | | |
| --- | --- | --- |
| Complaint | R. 1 | Page ID # 1-32 |
| Order Regarding Dismissal of Plaintiffs' Claims | R. 47 | Page ID # 169 |
| Notice of Cross-Appeal | R. 51 | Page ID # 205-209 |

| **St. Juliana et al v. Oxford Community School District et al.** <br> **Case No. 2:22-cv-10805** | | |
| --- | --- | --- |
| Complaint | R. 1 | Page ID # 1-52 |
| Order Regarding Dismissal of Plaintiffs' Claims | R. 53 | Page ID # 221 |
| Notice of Cross-Appeal | R. 58 | Page ID # 260-265 |

| **Watson et al. v. Oxford Community School District et al.** <br> **Case No. 2:22-cv-11959** | | |
| --- | --- | --- |
| Complaint | R. 1 | Page ID # 1-63 |
| Order Regarding Dismissal of Plaintiffs' Claims | R. 23 | Page ID # 177 |